**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**NORTHSIDE REALTY ASSOCIATES,
INC., and Ed A. Isakson, Defendants-
Appellants.**

No. 72–2151.

United States Court of Appeals,
Fifth Circuit.

March 14, 1973.

See also D.C., 324 F.Supp. 287.

Harold L. Russell and Lloyd Sutter, Atlanta, Ga., for defendants-appellants.

Thomas M. Keeling, Atty., Housing Section, Dept. of Justice, Washington, D. C., John W. Stokes, Jr., U. S. Atty., Atlanta, Ga., Frank E. Schwelb and Harold H. Moore, Civil Rights Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

GOLDBERG, Circuit Judge:

This is an appeal from an order enjoining appellants, Northside Realty Associates, Inc. and its Executive Vice President, Ed A. Isakson, from violating the Fair Housing Act of 1968. Although we are unable to ascertain the precise legal rationale for the District Court's decision, the Court apparently based its decision on constitutionally impermissible grounds. We therefore remand for fresh findings of fact and conclusions of law.

This action was brought by the Civil Rights Division of the Justice Department pursuant to Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq., alleging that appellants had engaged in a policy and practice of racial discrimination against Blacks with respect to the purchase and sale of homes in the Metropolitan Atlanta, Georgia area. The government sought injunctive relief, claiming that appellants' actions constituted a pattern or practice of resistance to the Fair Housing Act of 1968, and had denied groups of persons rights granted by the Act raising an issue of general public importance. *See* 42 U.S.C. § 3613.[1]

After a three day non-jury trial, the District Court made the following pertinent factual findings:

Northside Realty Associates, Inc. is incorporated under the laws of the State of Georgia and is licensed to engage in the listing and selling of real estate. Its executive vice president, Ed Isakson, is also the sales manager for one of the Company's seven residential sales offices. Although Ed Isakson has not advertised, sold or shown any residential property since 1960, his broker's license inures to the benefit of the Company.

1. 42 U.S.C. § 3613 (Section 813, Civil Rights Act of 1968)

SEC. 813(a) Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this title, or that any group of persons has been denied any of the rights granted by this title and such denial raises an issue of general public importance, he may bring a civil action in any appropriate United States district court by filing with it a complaint setting forth the facts and requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for such pattern or practice or denial of rights, as he deems necessary to insure the full enjoyment of the rights granted by this title.

Northside, through its 165 salespeople and its brokers, acts as agent for listing sellers by presenting offers on behalf of potential buyers. Commissions are paid by the sellers when sales are consummated. The majority of such sales involve single family dwellings while a smaller proportion involve lots and multiple dwellings or commercial property. In the three years since the effective date of the Fair Housing Act, not a single one of the more than 3,000 homes sold by Northside has been sold to a black person.

Prior to the effective date of the Fair Housing Act, Ed Isakson violated the provisions of the Act by treating a black couple, the Bowers, in a discriminatory manner when he: (1) failed to discover the Bowers' total financial potential before determining what priced house they could afford; (2) denied that Northside had any houses listed within the price range of the Bowers without consulting the listing book or the agents in the office; and (3) referred the Bowers to a black real estate broker without "co-operating" or receiving a referral fee, when he had never referred a white buyer to a black real estate broker. This violation evidenced a pre-Act practice of violating the Fair Housing Act.

Subsequent to the effective date of the Fair Housing Act, Ed Isakson violated the provisions of the Act on two separate occasions. On one occasion he discriminated by denying to a prospective black buyer that he, Isakson, sold real estate, without explaining that Northside Realty, of which he was executive vice-president, did; and by immediately referring the black buyer to two other real estate companies that sold primarily to Blacks. Isakson subsequently held this mode of behavior out as a model to be employed by white real estate people who did not wish to deal with Blacks. On a second occasion, Isakson violated the Act by showing an intention not to co-operate with a black real estate broker unless ordered to do so by the District Court.

Finally, Isakson manifested an intent not to comply with the Fair Housing Act by stating that Congress had exceeded its constitutional authority in enacting the Fair Housing Act.[2]

After making the above findings of fact and conclusions of law, the Court held:

"The Court finds that Mr. Isakson's intentions [to resist compliance with the Act] have manifested themselves in his actions and that black people as a group have thereby been denied the protection guaranteed by the Act. This denial of protection is of sufficient importance to authorize the relief herein."

The Court then enjoined appellants from further discriminatory conduct and ordered them to take affirmative action to prevent future discrimination.[3]

2. In addition, the District Court found that allegations concerning statements made by one of Northside Realty's sales agents were irrelevant because those statements, even if proved, would not represent the sales policy of Northside Realty. The District Court also found that the allegations of one of the government's witnesses were not proved, not that they were "perjured" as appellants continually and erroneously state in their brief.

3. The District Court issued the following injunction:

NOW THEREFORE, pursuant to the foregoing Findings of Fact and Conclusions of Law, IT IS ORDERED, ADJUDGED AND DECREED that the defendants Northside Realty Associates, Inc., Ed A. Isakson, all the corporate defendant's officers, employees, brokers, agents and all persons in active concert or participation with any of them are enjoined from:

(1) Failing or refusing to negotiate for the sale of any dwelling, and from making any dwelling unavailable to any person because of race, color, religion, or national origin;

(2) Discriminating against any person in the terms, conditions, or privileges of purchase of a dwelling; or in

Appellants attack the District Court's order on a number of grounds:

(1) The two post-Act violations of the Fair Housing Act that the District Court found occurred were insufficient to raise an issue of general public importance justifying the granting of injunctive relief.

(2) The District Court's finding that appellant Isakson violated the Act was insufficient to support the conclusion of wrongdoing by Northside Realty.

(3) A finding of only one pre-Act violation does not support a finding of a pre-Act pattern or practice of violating the Fair Housing Act.

(4) The District Court's finding that appellant Isakson violated the Act on three occasions was based upon a legally impermissible inference drawn from Isakson's constitutionally protected challenge to the Act and was clearly erroneous.

We find that appellants' first two contentions are without merit but that his third and fourth points require that we remand to the District Court for further proceedings.

## I. PUBLIC IMPORTANCE

■■ Appellants urge that the District Court's finding of two post-Act violations by Mr. Isakson is insufficient to establish an issue of general public importance and that injunctive relief is therefore not authorized by 42 U.S.C. §

the services or facilities connected with such sale or purchase or with real estate brokerage, because of race, color, religion or national origin;

(3) Representing, explicitly or implicity, to any person because of race, color, religion or national origin, that any dwelling is unavailable for sale or inspection when such dwelling is, in fact, available;

(4) Discriminating against any person or persons on account of race, color, religion or national origin with respect to engagement of his services by defendants or any of them;

(5) Failing or refusing to cooperate with any broker or any representative of any corporate or individual broker, with respect to the sale or negotiation for sale of any dwelling, because of the race, color, religion, or national origin of the broker, the sales person, or the client on whose behalf such available dwellings are being sought, or because of racial occupancy patterns in any place or area.

IT IS FURTHER ORDERED that the defendants shall forthwith adopt and implement the following affirmative program to assure nondiscriminatory treatment of Negroes and to correct the effects of their past discriminatory practices and image:

(1) The defendants shall, within 30 days of the entry of this Order, conduct an educational program for its sales personnel and other agents and employees to inform them of the provisions of this decree and their duties under the Fair Housing Act. Such a program shall include the following:

(a) A copy of this decree shall be furnished to each salesperson and other employee;

(b) By general meeting or individual conference, the defendants shall inform each salesperson and other employee of the provisions of this decree and of the duties of the company and its agents and employees under the Fair Housing Act.

(2) Throughout the calendar years 1972 and 1973, the defendants shall maintain separate records on each inquiry from potential buyers and/or sellers who are identified or are identifiable as members of the Negro race. Each record should include the following information:

(a) the inquirer's name;

(b) the services requested or desired;

(c) the services actually rendered;

(d) the name of the person and the office handling the inquiry or transaction;

(e) the date of the initial inquiry;

(f) the date the service, if any, was rendered;

(g) if no service was rendered, the reason therefor.

The defendant shall maintain these records as permanent files of the company for three years from this date unless further ordered by this Court. Furthermore the defendants shall make these records available for inspection by a representative of the Attorney General of the United States at six-month intervals during 1972 and 1973.

3613.[4] This contention is meritless. The question of what constitutes an issue of general public importance is, absent specific statutory standards, a question most appropriately answered by the executive branch. United States v. Bob Lawrence Realty, Inc., 5 Cir. 1973, 474 F.2d 115. *See* United States v. Greenwood Municipal Separate School Dist., 5 Cir. 1969, 406 F.2d 1086, 1090; Boyd v. United States, E.D.N.Y.1972, 345 F. Supp. 790, 794. Just as in his determination whether to prosecute a criminal case, the Attorney General must have wide discretion to determine whether an issue of public importance is raised. "Once the Attorney General alleged that he had reasonable cause to believe that a violation of . . . [the Fair Housing Act] denied rights to a group of persons and that this denial raised an issue of general public importance, he had standing to commence an action in District Court and to obtain injunctive relief upon a finding of a violation of the Act." United States v. Bob Lawrence Realty, Inc., *supra*, 474 F.2d at p. 125 n. 14 (citations omitted).

## II. CORPORATE LIABILITY

■ Northside Realty argues that the District Court's findings of one pre-Act violation and two post-Act violations by the individual appellant, Ed Isakson, are insufficient to impute liability to the corporate appellant, Northside Realty. Northside urges that the District Court's finding of corporate liability *does not comport with* this Circuit's decision in Standard Oil Co. of Texas v. United States, 5 Cir. 1962, 307 F.2d 120, because (1) the evidence fails to establish that Isakson was acting within the scope of his employment when the violations occurred, since by stipulation Isakson is not normally a real estate salesperson, and (2) Isakson was not shown to have been acting with the purpose of benefiting the corporate appellant when he violated the Act. In light of the fact that Ed Isakson (1) is the Executive

Vice President of Northside Realty, (2) is the broker whose license inures to the benefit of the corporation and enables it to engage in the business of selling real estate, and (3) directly supervises one sales office of Northside Realty and is in charge of hiring or selecting the sales managers for the other Northside offices, we do not think it clearly erroneous for the District Court to conclude that appellant Isakson acted within the scope of his duties when he spoke to customers at the office that he supervised and when he discussed sales policy with other people in the real estate business. Nor do we think the District Court was clearly erroneous in finding that these activities were conducted with the intention of benefiting the corporation for which Isakson served as executive vice president. *See* Standard Oil Co. of Texas v. United States, *supra*.

## III. THE AMBIGUITIES OF THE DISTRICT COURT'S ORDER

42 U.S.C. § 3613 authorizes the District Court to grant injunctive relief pursuant to a complaint by the Attorney General if the court finds (1) an individual pattern or practice of acts violating the Fair Housing Act, *see* United States v. Reddoch, 5 Cir. 1972, 467 F.2d 897; United States v. West Peachtree Tenth Corp., 5 Cir. 1971, 437 F.2d 221; or (2) a group pattern or practice of violating the Act, *see* United States v. Bob Lawrence Realty, Inc., 5 Cir. 1973, 474 F.2d 115; or (3) that an act, or acts violative of the Fair Housing Act denied a group of persons rights protected by the Act, *see* United States v. Bob Lawrence Realty, Inc., *supra*.

In considering the Attorney General's request for injunctive relief in the instant case, the District Court stated the issue in this manner:

"The question before this Court is whether the [government] . . . has met [its] . . . burden of proving that Northside Realty and Ed Isakson have engaged in a discrimina-

4. *See* note 1, *supra*.

tory 'pattern or practice' of selling real estate."

However, the Court subsequently held:

"The Court finds that Mr. Isakson's intentions [to resist compliance with the Act] have manifested themselves in his actions and that black people as a group have thereby been denied the protection guaranteed by the Act. This denial is of sufficient public importance to authorize the relief herein granted."

The District Court's conclusion of law thus does not respond to its statement of the issue, and we are unable to ascertain clearly the legal rationale of the court's decision. The court might have based its granting injunctive relief: (1) upon a finding that the Bowers incident evidenced a pre-Act pattern or practice of violating the Fair Housing Act that was continued after the effective date of the Act; or (2) upon a finding that Isakson's verbal challenge to the constitutionality of the Fair Housing Act evidenced an intent to violate the Act that was carried out in two post-act incidents; or (3) upon a finding that two post-Act incidents violated the Act and evidenced a pattern or practice of violating the Act; or (4) solely upon a finding that the two post-Act incidents violated the Act and denied rights protected by the Act to a group of persons.

■ Appellants argue that the District Court's order was based on a finding that appellant Isakson's conduct toward the Bowers established a pre-Fair Housing Act pattern or practice of discriminatory conduct that the Court felt was continued by appellants subsequent to the effective date of the Act. In United States v. West Peachtree Tenth Corp., *supra*, we discussed the meaning of the terms "pattern or practice" as utilized in 42 U.S.C. § 3613: "The words 'pattern or practice' were not intended to be esoteric words of art. There is nothing magic in their meaning. To be sure, they were intended to encompass more than an 'isolated or ac-

cidental or peculiar event.'" United States v. West Peachtree Tenth Corp., *supra*, 437 F.2d at 227 (citations omitted). Although, "[e]ach case must turn on its own facts," *id.*, we do not think that the District Court's finding of one pre-Act violation, standing alone without a finding of any other factors to support its decision, can justify a finding of a pre-Act pattern or practice. The District Court could thus not properly base a finding of a Post-Act pattern or practice solely on a finding that the Bowers incident evidenced a pre-Act pattern or practice that subsequently was continued.

Appellants also urge that the District Court's finding that appellant Isakson violated the Fair Housing Act on three occasions was predicated upon a legally impermissible inference of wrongful intent that the Court deduced from Isakson's constitutionally protected challenges to the authority of Congress to pass the Fair Housing Act. Appellants also contend that the District Court's findings in this regard were clearly erroneous.

In a pre-trial statement entered into the record, Isakson stated:

"I am familiar with the Fair Housing or Civil Rights Act of 1968; and I know that the Act makes certain actions illegal, *so far as Congress has authority within the limitations of the U. S. Constitution* to make such actions illegal. Although I believe that my firm and I have complied with the Act, I personally believe that Congress may have exceeded its authority under the Constitution in enacting the Act and I intend to challenge Congress' action in this litigation in hopes that this Court will interpret the law and decide the case in my favor."

The District Court held:

"The Court takes note that the government filed this case and presented it with little evidence to support its position that the defendants were engaged in a pattern or practice of dis-

crimination. At the time suit was filed, the government's case consisted of one pre-Act incident and one post-Act incident (which later failed of proof). Mr. Isakson's own actions and statements that Congress has exceeded its constitutional limitations, however, indicate his intention on behalf of himself and the company to resist compliance with the purposes of the Fair Housing Act. The Court finds that Mr. Isakson's intentions have manifested themselves in his actions and that black people as a group have thereby been denied the protection guaranteed by the Act. This denial of protection is of sufficient public importance to authorize the relief herein granted."

■■■ We seriously doubt that the learned court below would have based its finding that appellants violated the Fair Housing Act on an unconstitutional ground, however, its opinion is ambiguous on this point. Certainly if the District Court did base its decision that appellants violated the Fair Housing Act upon appellant Isakson's challenge to the constitutionality of the Fair Housing Act, its decision would be fatally infirm. Due process of law demands that a party not be penalized for exercising his right to raise the defense that the Act which he is being charged with violating is unconstitutional. United States v. Butler, 6 Cir. 1968, 389 F.2d 172, cert. denied, 1968, 390 U.S. 1039, 88 S.Ct. 1636, 20 L.Ed.2d 300; *cf.* Griffin v. California, 1965, 380 U.S. 609, 85 S.Ct. 1229, 14 L. Ed.2d 106. "Moreover, the First Amendment, which protects a controversial as well as a conventional dialogue,

. . . extends to petitions for redress of grievances as well as to advocacy and debate." Whitehill v. Elkins, 1967, 389 U.S. 54, 57, 88 S.Ct. 184, 185, 19 L.Ed.2d 228, 231 (citations omitted).

■■■ Individuals accept the role of martyrs by defying laws to test their constitutionality, and if the laws are found to be constitutional the individual must accept the inexorable consequence, martyrdom; but our Constitution forbids that anyone should be found to have violated a law for opining that the law is unconstitutional. The proposition is too axiomatic to explicate that a person can express an opinion that a law is unconstitutional, and Isakson for a thousand times could have declared with impunity that the Fair Housing Act is unconstitutional, for these asseverations may not constitute proof of a violation. Isakson may well suffer the sanctions of law for what he did, for after reading this record, we do not find that the District Court was clearly erroneous in finding that appellants violated provisions of the Fair Housing Act; however, we want to remove any clouds of uncertainty and thus clear away all possibility of any miasma of dubiety. We know that the learned trial judge would not want us to wallow in doubt, and we cannot affirm if there is the slightest possibility that his decision rested upon a constitutionally impermissible ground. United New York and New Jersey Sandy Hook Pilots Asso. v. Halecki, 1959, 358 U.S. 613, 79 S.Ct. 517, 523, 3 L.Ed.2d 541; Street v. New York, 1969, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572; Chapman v. California, 1967, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.[5]

5. Appellant also urges that the District Court failed to make findings with respect to material issues required by Rule 52(a) Fed.R.Civ.P. because it failed to specifically comment on all of the evidence adduced by appellants. In light of our disposition of this matter we think it suffices to note that "Courts need not indulge in exegetics, or parse or declaim every fact and each nuance and hypothesis," Gulf King Shrimp Co. v. Wirtz, 5 Cir. 1969, 407 F.2d 508, 516, and that

"there is absolutely no indication that the trial court did not consider the evidence that appellants claim was ignored. All of the facts were admitted into evidence and the trial court's failure to mention each and every specific item in its memorandum opinion in no way indicates that they were not considered, weighed, and rejected as inconclusive." Ramey Const. Co., Inc. v. Local Union No. 544, 5 Cir. 1973, 472 F.2d 1127.

■ The government correctly urges that if we ignore the District Court's statements concerning appellant Isakson's challenge to the validity of the Fair Housing Act, the District Court's finding that Isakson committed two post-Act violations is not clearly erroneous and would alone support the granting of injunctive relief. Appellants correctly urge that if the District Court made those findings of post-Act violations relying upon its drawing of unconstitutional inferences from Isakson's challenge to the Act, its order is fatally infirm and must be reversed. "In effect, the parties urge that we pick and choose to come to conclusions each asserts is required under the clearly erroneous concept. But this is not our role. It deprecates the function of the trial. Armed with the buckler and shield of F.R.Civ.P. 52(a), as findings come to us, we can perform our limited role only as we know with reasonable assurance just what the Judge has found." Mladinich v. United States, 5 Cir. 1967, 371 F.2d 940, 942 (citations omitted). Since we are unable to ascertain either the principle of law the District Court applied or the constitutional propriety of its fact findings, we think that justice demands that we remand this case to the District Court for a reconsideration of the facts in light of this opinion and for new conclusions of law.

The record could support findings and conclusions of law that justify equitable relief, but we must be able to read such findings clearly and distinctly. The trial court's findings are only clearly erroneous if they were based (1) on a belief that Isakson's claimed intention to test the constitutionality of the Fair Housing Act showed an intent to violate the Act, or (2) on the finding that the Bowers incident standing alone evidenced a pre-Act pattern or practice. We must be absolutely certain that the trial court's findings were not tainted by a belief that Isakson's challenge to the constitutionality of the Act was probative of an intent to violate the Act. If this theory prevailed, no one could verbalize constitutional rights or theories. If the trial court found a violation because of Isakson's constitutional opinionativeness, this finding is repugnant to the First Amendment. We are constantly vigilant lest the non-conformist be chilled in the expression of ideas, and we must be just as watchful of any ideational concept, regardless of its source or content.

■ We recognize that the specificity and exactitude of a blueprint is not essential to findings of a violation of the Act. We remand for clarity to be certain that Isakson's public declaration of a constitutional opinion did not become the basis for a finding of a violation and that the trial court's decision was thus not sullied by an impermissible inference. Therefore, in reconsidering its order, the District Court may not consider appellants' challenge to the constitutionality of the Fair Housing Act as probative of a violation of the Act. If it again finds that appellants' activities violate the Act, it should then grant injunctive relief only upon a finding that appellants participated in a pattern or practice of violating the Act or upon a finding that appellants have denied a group of persons rights granted by the Act. We express no opinion as to the appropriate determination of this matter on remand. We merely direct the District Court to enter fresh findings of fact and conclusions of law not inconsistent with this opinion.

Remanded.