GOLDBERG, Circuit Judge:
I. Introduction
This bankruptcy case involves a revolving line-of-credit and accounts receivable financing arrangement entered into by the Missionary Baptist Foundation of America, Inc. (“the Debtor”) and the First National Bank at Lubbock, Texas (“the Bank”). The Debtor operated a group of affiliated nursing homes as separate corporations in Texas and other states. The Debtor had a chronic cash-flow problem, because its primary source of income was medicare and medicaid cost reimbursement payments that were typically not received until a month or more after services had been rendered.[1]
In an attempt to remedy this problem the Debtor negotiated a $500,000 line of credit at the Bank on June 12, 1979.[2] The Loan Agreement was signed by the cognizant officers of each of the Debtor’s affiliated corporations, which were listed at the beginning of the document.[3] The term of this financing was limited to six months, with automatic extensions for additional *755 six-month periods unless either party terminated the Agreement in the manner provided for. A separate Security Agreement was also executed by the parties the same day.[4]
Pursuant to these agreements an arrangement was set up whereby the Debt- or’s medicare and medicaid reimbursement payments would be received directly at the Bank. As the payments arrived they were immediately applied to the Debtor’s loan balance, which could then be re-extended up to the maximum of $500,000.
Even this amount of credit proved insufficient, however, so on May 29, 1980, the Debtor took out a separate $350,000 loan at the Bank. This loan was also secured by the Debtor’s accounts receivable.[5]
During the summer of 1980 the Debtor’s financial situation began to deteriorate rapidly. Overdrafts of more than a million dollars began appearing on the Debtor’s account. The Bank notified the Debtor in June that it was reviewing the situation and would renew the $500,000 master note for only three months. The Bank also requested extensive financial information and documentation from the Debtor.
On October 14, 1980, the Bank notified the Debtor that it was terminating their financing arrangements. The Bank immediately began collecting all available assets of the Debtor and applying them to the outstanding loan balance. The Debtor’s payroll checks were no longer honored by the Bank. On October 15, 1980, the Debtor filed a petition for relief under Chapter 11 of Title 11, United States Code. That same day an officer of the Bank flew to Austin, Texas, and picked up several unprocessed warrants for payment to the Debtor’s account and brought them to the Bank later in the day.
Shortly thereafter a trustee in bankruptcy, Robert B. Wilson (“the Trustee”), was appointed. The Trustee brought suit against the Bank, alleging invalid financing arrangements, preferential payments, post-petition transfers, fraudulent conveyances, and the like. In October, 1984, the case came on for a bench trial before the Honorable Bill H. Brister in the United States Bankruptcy Court for the Northern District of Texas. The bankruptcy court ruled against the Trustee on. all counts, but did require the Bank to file an amended claim. See Memorandum and Order of Feb. 25, 1985, 48 BR 885, at 28-29. The district court, Woodward, C.J., affirmed the bankruptcy court’s judgment in all respects. See Order of June 18, 1985.
On appeal to this court the Trustee raises the following issues:
1. The Bankruptcy Court erred in determining the Bank’s purported security interest in Debtor’s accounts receivable to be valid.
2. Assuming validity of the purported security interest, the Bank improved its position during the 90 days preceding bankruptcy.
3. The Bank’s purported security interest in accounts receivable from AMH OF THE GREENBELT was not properly perfected.
4. The Trustee established all of the elements of voidable preferences against the Bank on transfers occurring within 90 days of bankruptcy-
*756 5. The “ordinary course of business” exception to a preferential payment is not available to the Bank as a matter of law, or in the alternative, the evidence does not establish such affirmative defense.
6. The Bank’s transfers from Debtor initiated on October 15, 1980 were violative of the automatic stay or in the alternative, were preferential payment recoverable by the Trustee.
7. The Bank’s transfers from Debtor’s account subsequent to October 15, 1980 were post-petition transfers recoverable by the Trustee.
8. The Bank’s application of $10,373.16 to the indebtedness of WEST TEXAS HOME HEALTH AGENCY on October 15, 1980 was a fraudulent conveyance recoverable by the Trustee.
9. Payment of $108,324.24 on the $350,000 note was a preferential transfer.
10. The Bank’s conduct on the date of bankruptcy and thereafter would justify subordination of its claim.
11. An award of special damages and/or attorney’s fees would be appropriate in this case.
Appellant’s Brief at vii.
II. Standard of Review
The bankruptcy court’s findings of fact will be accepted by this court unless they are clearly erroneous and its judgment will be sustained unless based on an incorrect view of applicable law. Matter of Missionary Baptist Foundation, 792 F.2d 502, 506 n. 2 (5th Cir.1986); Bankr.Rule 8013; Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1307-08 (5th Cir.1985); Mitsubishi International Corporation v. Clark Pipe and Supply Co., Inc., 735 F.2d 160 (5th Cir.1984); Highland Village Bank v. Bardwell, 610 F.2d 228 (5th Cir.1980). A finding of fact is clearly erroneous when “although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” United States v. United States Gypsum Company, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Strict application of the clearly-erroneous rule is “particularly important where, as here, the district court has affirmed the bankruptcy judge’s findings.” Matter of Missionary Baptist Foundation of America, Inc. v. Huffman, 712 F.2d 206, 209 (5th Cir.1983) (citing cases). But the clearly-erroneous standard “does not inhibit an appellate court’s power to correct errors of law.” Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984).
III. Can the Debtor’s Accounts Receivable Collateralize the Bank’s Loans?
The most far-reaching argument made by the Trustee is that the Debtor’s accounts receivable could not serve as collateral for the Bank’s loans. The Trustee rélies for this proposition on provisions of state and federal law purportedly prohibiting the assignment or attachment of medical care payments. Resolution of this issue will determine the disposition of.many of the other matters raised on appeal.
Title XIX of the Social Security Act (42 U.S.C. §§ 1396 et seq.) specifies the conditions under which the federal government makes grants to the states through medical assistance programs. Participating states must have “state plans” that meet the requirements of the federal statute, see 42 U.S.C. § 1396a. One of these requirements is that
A State plan for medical assistance must—
... provide that no payment under the plan for any care or service provided to an individual shall be made to anyone other than such individual or the person or institution providing such care or service, under an assignment or power of attorney or otherwise, except that—
(A) in the case of any care or service provided by a physician, dentist, or oth *757 er individual practitioner, such payment may be made (i) to the employer of such physician, dentist, or other practitioner if such physician, dentist, or practitioner is required as a condition of his employment to turn over his fee for such care or service to his employer, or (ii) (where the care or service was provided in a hospital, clinic, or other facility) to the facility in which the care or service was provided if there is a contractual arrangement between such physician, dentist, or practitioner and such facility under which such facility submits the bill for such care or service; and
(B) nothing in this paragraph shall be construed (i) to prevent the making of such a payment in accordance with an assignment from the person or institution providing the care or service involved if such assignment is made to a government agency or entity or is established by or pursuant to the order of a court of competent jurisdiction, or (ii) to preclude an agent of such person or institution from receiving any such payment if (but only if) such agent does so pursuant to an agency agreement under which the compensation to be paid to the agent for his services for or in connection with the billing or collection of payments due such person or institution under the plan is unrelated (directly or indirectly) to the amount of such payments or the billings therefor, and is not dependent upon the actual collection of any such payment. . . .
42 U.S.C. § 1396a(a)(32) (emphasis added).[6]
The federal statute does not prescribe the precise language that states are to use in meeting its requirements. Indeed, “Within the confines of the statute, rules, and regulations, the states enjoy considerable flexibility in fashioning their own reimbursement systems.” Danvers Pathology Associates, Inc. v. Atkins, 151 F.2d 427, 428 (1st Cir.1985). In attempting to meet the requirements of 42 U.S.C. § 1396a(a)(32) Texas has adopted the following provisions:
(a) Neither medical assistance nor payments to providers of medical assistance under this chapter are transferable or assignable at law or in equity.
(b) No money paid or payable under the provisions of this chapter is subject to execution, levy, attachment, garnishment, or any other legal process, or the operation of any insolvency law.
Tex.Hum.Res.Code Ann. § 32.036 (Vernon 1980).
Chapter 32 of the Texas Human Resources Code begins with a “General Provisions” section describing the purpose of the chapter and indicating how it is to be construed. The chapter’s purpose is “to enable the state to provide medical assistance on behalf of needy individuals and to enable the state to obtain all benefits for those persons authorized under the Social Security Act or any other federal act.” Section 32.001. As for its construction,
(a) This chapter shall be liberally construed and applied in relation to applicable federal laws and regulations so that adequate and high quality health care may be made available to all children and adults who need the care and are not financially able to pay for it.
(b) If a provision of this chapter conflicts with a provision of the Social Security Act or any other federal act and renders the state program out of conformity with federal law to the extent that federal matching money is not avail *758 able to the state, the conflicting provision of state law shall be inoperative to the extent of the conflict but shall not affect the remainder of this chapter.
Section 32.002.
Armed with this guidance from the Texas legislature we return to a comparison of 42 U.S.C. § 1396a(a)(32) and Tex.Hum.Res.Code § 32.036. As the Trustee correctly notes, “The Federal statute is not worded exactly like the state statute and in fact the state statute is broader and more rigid in its prohibitions.” Appellant’s Reply Brief at 1. It is apparent from a facial examination of the two statutes that cases decided under them could indeed come out differently, depending upon which applied. To the extent that a state statute conflicts with the federal Social Security Act, the former must yield to the latter. Rinefierd v. Blum, 412 N.Y.S.2d 526, 66 A.D.2d 351 (1979). Further, it appears that Tex.Hum.Res.Code § 32.036 is in conflict with the stated overall purpose of Chapter 32 (“to enable the state to provide medical assistance on behalf of needy individuals,” Section 32.001), because it would undercut a vital means of financing medical assistance for the needy:
Nursing homes, as are other “providers” under Medicaid, are reimbursed for services already furnished. This inevitably presents cash flow problems. The confidence of creditors in nursing homes which participate in the Medicaid Program, and their willingness to deal with such nursing homes on other than a cash-on-the-barrelhead basis, would be severely shaken if this Court were to interpret 42 U.S.C. § 1396a(a)(18) as mandating the suspension of the effectiveness of New York’s lien laws with respect to Medicaid Program providers.
Sasse v. Ottley, 432 F.Supp. 440, 443 (S.D.N.Y.1977). Part (a) of Section 32.002 counsels us that the provisions of Chapter 32 “shall be liberally construed and applied ... so that adequate and high quality health care” will be available for the needy. Part (b) instructs us that in cases of “conflict” or “non-conformity” with federal law, the Texas provision will be read out of Chapter 32 and replaced with its federal counterpart. Under either approach, then, it appears that Section 32.036 cannot be interpreted to prevent the kind of loan financing at issue in this case.
Viewed in terms of the federal standard, the Bank’s reimbursement agreement with the Debtor passes muster. 42 U.S.C. § 139a(a)(32) provides that “nothing in this paragraph shall be construed ... to preclude an agent of [the person or institution providing the care or service involved] from receiving any such payment” so long as a “factoring” arrangement is not used.[7] The 1977 committee report elaborates that “The bill ... would not preclude the agent of a physician or other person furnishing services from collecting any medicare or medicaid payment on behalf of a physician,” and states further that
Nor is it the committee’s intention that this provision preclude the legitimate transfer of accounts receivable from these programs by an individual or an institution upon the “sale” of the individual’s practice (for example upon retirement) or as part of the sale of all the assets of an institution.
H.R.Rep. No. 393, 1977 U.S.Code Cong. & Ad.News at 3051-52.
Under the procedures used in this case, a warrant, or non-negotiable voucher for payment, was issued by the cognizant officer of the state agency making payment to the Debtor for medical services and treatment already rendered.[8] Capital National Bank *759 in Austin presented the warrant for payment to the State Treasurer in Austin, thereby receiving in return a negotiable instrument, which it would then wire-transfer to the Debtor’s account at the First National Bank in Lubbock. The bankruptcy court found that
After the Capital National Bank made its presentment to the State Treasurer each month and received the negotiable instrument the monies represented by the warrant were wire-transferred to the MSC Associates account at the First National Bank at Lubbock. The testimony at trial reflected that those monies were initially deposited in the MSC account in order to facilitate debtor’s bookkeeping procedures and then those monies immediately were removed by the bank and credited to the line of credit.
Memorandum and Order at 6. The bankruptcy court found further that “The warrant was payable to the debtor. When it was paid by the State Treasurer ... those proceeds were wire-transferred to the debt- or’s account at First National Bank____”
Id. at 17.
There is nothing in these arrangements to suggest a violation of 42 U.S.C. § 1396a(a)(32). We therefore affirm the decision of the district court and hold that the Bank took a valid security interest in the Debtor’s accounts receivable.
IV. Were There Any Preferential Payments Under 11 U.S.C. § 547?
The Trustee’s second main argument is that, even if the Bank took a valid security interest in the accounts receivable, the Debtor’s loan repayments during the ninety days preceding bankruptcy amount to voidable preferences under 11 U.S.C. § 547(b). The Bank defends under 11 U.S.C. § 547(c)(5), which invokes what is known as the “improvement in position” exception. The Bank argues that it was “fully secured at all times,” Appellee’s Brief at 17, and therefore “the payment to it under its lines of credit could not have resulted in an improvement of its position,” id. at 25 (emphasis added). It is a commonplace that preference law exempts fully secured creditors from its grasp.[9]
11 U.S.C. § 547(c)(5) provides:
(c) The trustee may not avoid under this section a transfer—
(5) of a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transféree caused a reduction, as of the date of the filing of the petition and to the prejudice of other creditors holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of all security interest for such debt on the later of—
(A) (i) with respect to a transfer to which subsection (b)(4)(A) of this section applies, 90 days before the date of the filing of the petition; or
(ii) with respect to a transfer to which subsection (b)(4)(B) of this section applies, one year before the date of the filing of the petition; and
(B) the date on which new value was first given under the security agreement creating such security interest____
Pub.L. 95-598, 92 Stat. 2597 (1978).[10] The “two-point net improvement” test of Sec *760 tion 547(c)(5) requires, in the present case, a computation of (1) the loan balance outstanding ninety days prior to bankruptcy; (2) the value of the accounts receivable on that day; (3) the loan balance outstanding on the day the bankruptcy petition was filed; and (4) the value of the accounts receivable on that day.[11] According to the Trustee’s calculations, the Bank was “undersecured” by $160,883.58 ninety days pri- or to bankruptcy, and “oversecured” by $162,617.37 on the day of bankruptcy. See Appellant’s Brief at 11-12, 15-15A; Plaintiff’s Exhibit 142; Testimony of Robert Cash, III Statement of Facts 449-52. Thus, according to the Trustee’s computations, the Bank improved its position by $323,500.89 during the preference period.[12] As the Bank sees it, however, “One must look at the entire loan transaction as a ‘pot’ of accounts receivable, which was the basis of the Bank’s advances and loans under its revolving line of credit. To attempt to break this transaction into a daily basis, simply because the bankruptcy was filed in the middle of the month, is to distort the entire transaction.” Appellee’s Brief at 16-17. The Bank thus maintains that “All evidence shows at all times material to this litigation, that the total monthly accounts receivable of the Debtor and its affiliated group never was lower than the amount of the revolving line of credit, which was $500,000.00.” Id. at 15-16 (emphasis added) (citing testimony); see also Defendant’s Exhibit 201.
The bankruptcy court made no specific findings of fact on this issue. Instead, the court simply stated that “the evidence does not support the trustee’s position that the bank improved its position within 90 days of bankruptcy.” Memorandum and Order at 20; see also id. at 19 (“the bank was fully secured against accounts receivable for all of the line of credit financing”); id. at 26 (same). The district court’s review of this issue was equally conclusory and unilluminating:
The trustee’s other principal attack on the Bankruptcy Court’s judgment concerns the court’s conclusion that FNB did not improve its position within 90 days of the filing of the bankruptcy petition. Although the trustee’s witness Mr. Robert Cash testified that FNB did improve its position during the 90 days preceding bankruptcy, cross-examination cast considerable doubt on his conclusions. The court agrees with the Bankruptcy Court that the credible evidence does not reveal any improvement in position that would allow the trustee to recover any amount under Bankr.Code § 547(c)(5).
*761 Order at 3. This court is thus left with no basis for deciding whether the bankruptcy court’s “findings” on this issue were clearly erroneous or not; indeed, we have no basis for meaningful review at all. See Bankr.Proc.Rule 7052 (incorporating Fed.R.Civ.P. 52 by reference); Golf City, Inc. v. Wilson Sporting Goods Co., Inc., 555 F.2d 426, 432 (5th Cir.1977) (requiring a “clear understanding of the ground or basis of the decision of the trial court”); Theriault v. Silber, 547 F.2d 1279, 1280-81 (5th Cir.) (findings inadequate in absence of “any indications of how, why, or on what basis” they were reached), cert. denied, 434 U.S. 871, 98 S.Ct. 216, 54 L.Ed.2d 150 (1977); Sellers v. Wollman, 510 F.2d 119 (5th Cir.1975).
The proper solution is to remand the case for a factual determination as to whether the Bank improved its position during the ninety-day preference period. See 13 Collier on Bankruptcy ¶ 752.02 (14th ed. 1985); Pullman-Standard v. Swint, 456 U.S. 273, 290-93, 102 S.Ct. 1781, 1791-93, 72 L.Ed.2d 66 (1982); Hydrospace-Challenger, Inc. v. Tracor/Mas, Inc., 520 F.2d 1030 (5th Cir.1975) (remanded where findings were couched in conclusory terms); United States v. Northside Realty Associates, Inc., 474 F.2d 1164 (5th Cir.1973) (remanded where court of appeals was unable to determine precise legal rationale of trial court’s decision), cert. denied, 424 U.S. 977, 96 S.Ct. 1483, 47 L.Ed.2d 747 (1976); Ionmar Compania Naviera, S.A. v. Olin Corp., 666 F.2d 897 (5th Cir.1982); Fortner v. Balkcom, 380 F.2d 816 (5th Cir.1967). Such a determination should yield at least four numbers: (1) the loan balance outstanding ninety days prior to bankruptcy; (2) the value of the accounts receivable on that day; (3) the loan balance outstanding on the day the bankruptcy petition was filed; and (4) the value of the accounts receivable on that day.[13]
The above instructions on remand do not end our inquiry, however, because Congress did not define the term “value” for purposes of Section 547,[14] and several different alternatives suggest themselves.[15] In particular, simply taking the value of accounts receivable as their “face value” might place an undue burden on the Bank if, as appears to be the case, the accounts receivable outstanding on the day of bankruptcy were not or could not in fact be collected in full. Thus, a more particularized, individualized assessment may be in order:
An individualized approach need be neither difficult to apply nor arbitrary. In each bankruptcy proceeding, the creditor or the trustee at some point liquidates the accounts receivable constituting collateral. This can be done either by collecting the accounts or by selling them. To determine whether the creditor is in a better position than it would have been had bankruptcy been declared ninety days earlier, the appropriate comparison would seem to be between the proceeds of the receivables actually liqui *762 dated after bankruptcy and the amount which would have been obtained if the receivables serving as collateral ninety days earlier had been liquidated in the same manner. In other words, if the receivables at bankruptcy were liquidated by collection, the comparison should be with the amounts actually collected from receivables serving as collateral ninety days before bankruptcy. If the receivables were liquidated by sale, the comparison should be with the amount which would have been received had the receivables serving as collateral ninety days before bankruptcy been sold. Thus, the first example adopts a collection value approach, while the second uses a market value approach. Because this individualized approach defines “value” in accordance with the method actually chosen to transform the accounts receivable to cash, it more accurately measures how much a particular creditor actually improved its eventual position during the ninety days before bankruptcy.
Cohen, supra, 66 Minn.L.Rev. at 664 (footnotes omitted). See also 11 U.S.C. § 506(a) (“value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor’s interest”); H.R.Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), reprinted in 1978 U.S.Code Cong. & Ad. News 5963, 6312 (“Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case.”).
V. Did the Bank Have a Perfected Security Interest in a Later-Acquired Subsidiary’s Receivables?
The next significant issue is whether the Bank held a perfected security interest in reimbursements payable to AMH of the Greenbelt, Inc., a company acquired as a subsidiary of the Debtor after execution of the original security agreement. The bankruptcy court found that
The trustee’s challenges to the payments attributable to AMH of the Greenbelt, aggregating $493,310.87, are more troublesome. At the time the original financing arrangements were made by debtor and the bank on June 12, 1979, that entity was not in existence and the six homes which were under its umbrella were not owned by the debtor. They were acquired by the debtor later in 1979. The AMH of the Greenbelt entity never executed a security agreement, the loan agreement, and the financing statement.
Memorandum and Order at 21-22.
The Bank concedes that neither its loan agreement nor its security agreement or financing statements included AMH of the Greenbelt. See Appellee’s Brief at 28. However, the Bank argues that “regardless of the fact that the Loan Agreement may not have been amended to provide for the new entity nor the execution of formal security agreements and financing statements, AMH of the Green Belt, Inc. was included in the financing arrangements dealing with the handling of the warrants and the checks from the State of Texas with the bank in Austin.” Id. In other words, the Bank relies simply on the fact that a letter to another bank, signed by the Debtor and the Bank, mentions AMH of the Greenbelt along with the other institutions in whose accounts the Bank had a perfected security interest. But as counsel for the Bank acknowledged at oral argument, the reference to AMH of the Greenbelt in this correspondence was not an “amendment” to the security agreement.
The Bank argues further — apparently on the theory that an executed security agreement was unnecessary — that AMH of the Greenbelt “merely blended in with all other entities and organizations of the Debtor____ [It] fell into the fold and operated in the exact same manner as all previously existing entities and of all entities who executed the loan documents back in June, 1979.” Appellee’s Brief at 27-28. Since the proceeds of all the Debtor’s affiliates’ accounts receivable — including those of *763 AMH of the Greenbelt — were funneled through one account at the Bank, the Bank maintains that it “duly perfected its security interest" in the proceeds and accounts receivable of AMH of the Greenbelt merely by taking possession of them. Id. at 30. The Bank cites no case authority for this proposition (or, for that matter, for any other point in its entire section on AMH of the Greenbelt). However, it does quote Tex.Bus. & Com.Code § 9.203(a)(1) as follows:
“... a security interest is not enforceable against the debtor or third parties unless (1) the collateral is in the possession of the secured party____”
This is, of course, equivalent to arguing: “Something is not an apple unless it is red. This tomato is red. Therefore this tomato is an apple.” [16]
We conclude that the Bank did not have a valid security interest in the accounts receivable of AMH of the Greenbelt, Inc. or in the proceeds of those accounts receivable. The Bank has, at best, an unperfected security interest in the AMH of the Greenbelt accounts, no matter what was originally “intended” between it and the Debtor. See In re McBee, 714 F.2d 1316, 1321 (5th Cir.1983) (critical inquiry in assessing whether a security interest is perfected is whether a reasonably prudent subsequent creditor would have discovered the prior security interest); Johnson Controls, Inc. v. City of Cedar Rapids, Iowa, 713 F.2d 370, 375 (8th Cir.1983) (we are to determine the parties’ intent “from what they said and not from what they meant to say”); In re S.O.A.W. Enterprises, Inc., 32 B.R. 279 (Bankr.W.D.Tex.1983); Matter of Munzenreider Corp., 34 B.R. 82 (Bankr.M.D.Fla.1983). The Trustee may avoid as preferential payments made on an account that was not covered by a properly perfected security interest. 11 U.S.C. § 544(a); Tex.Bus. & Comm.Code § 9.301; In re Ken Gardner Ford Sales, Inc., 23 B.R. 743 (E.D.Tenn.1982). We therefore remand this issue for a factual determination as to the amounts from the AMH of the Greenbelt accounts that were applied to the Debt- or’s loan balance during the preference period; after such a determination has been made the district court is to enter judgment in favor of the Trustee in that amount.
VI. Post-petition Transfer of Warrants
The Trustee raises a number of issues regarding post-petition transfers, in particular the transfer of three warrants supposedly applied to the Debtor’s loan balance on the day of bankruptcy. On this matter the bankruptcy court found as follows:
The contention that the automatic stay was violated, and that preferential transfers occurred, when the bank applied $52,097.53 postpetition presents a difficult issue. When the bank notified debt- or on October 14,1985, that it was terminating the financing arrangements the bank immediately commenced gathering all assets available to it to apply against the line of credit and the guaranties. Three warrants totalling $52,097.53 had issued from the state which had not been received at the First National Bank. The loan officer flew to Austin, arranged for the presentment of the warrants to the State Treasurer, and returned them to Lubbock at a time in the afternoon of October 15, 1980, which is not reflected in the record. The only testimony as to time those proceeds were applied to the debts was that it occurred after the bank had closed for business on that day.
Memorandum and Order at 23. The bankruptcy petition was filed at 4:41 p.m. that same day. Id.
*764 According to the Bank, the fact that the warrants were processed “the night of October 15,1980, is immaterial since the Bank had possession and started the process of applying those proceeds prior to the time of filing.” Appellee’s Brief at 36. The warrants were not negotiable instruments; as the Bank correctly notes, they were actually two steps short of cash:
These warrants were not a cash item and had to be in turn presented to the State Treasurer’s office where the warrant had to be exchanged for a check written on a bank account of the State of Texas. Then this check had to be cashed and turned into cash before the money could actually be realized on the initial warrant.
Id. at 4; see also Memorandum and Order at 5 (“A warrant is a voucher for payment of a sum of money. It is not a negotiable instrument but is an order by which the drawer authorizes the State Treasurer to pay a particular sum of money.”). Thus even on the Bank’s own version, or theory, of “what happened when,” the actual transfer of $52,097.53 to the Bank could not possibly have occurred before the filing of the bankruptcy petition. Our conclusion is fortified by the Bank’s explanation, in a different context, of its treatment of the warrants:
[T]he Bank never asserted its interest in the cash proceeds until such time as those cash proceeds were actually deposited into the bank account of the Debtor, at the Bank. Then and only then would the Bank assert its interest in the proceeds of its collateral by applying the proceeds to the line of credit. Thus, the Bank has made no claim to the warrants which were secured and received by the Trustee, after the date of the filing of the bankruptcy because the warrants themselves were not the proceeds of the accounts receivable of the Debtor.
Appellee’s Brief at 6-7. In the case of the last three warrants, moreover, the proceeds of the warrants were never even deposited in the Debtor’s account. Memorandum and Order at 24; Testimony of Randy Neugebauer, II Statement of Facts 253-56, 297.
The Bank’s behavior in this instance is a perfect example of the sort of “last minute grab” that Congress attempted to prevent in the automatic stay provisions of 11 U.S.C. § 362. See Jackson supra, 36 Stan.L.Rev. at 760-64. We therefore hold that the $52,097.53 involved here must be returned to the estate pursuant to 11 U.S.C. § 549.
VII. Conclusion
Other issues raised on appeal by the Trustee do not merit extensive discussion. As explained earlier, see section II supra, our standard of review is a stringent one, and we may not set aside the findings of the district court unless we have “the definite and firm conviction that a mistake has been committed.” As to all issues not discussed above, therefore, we affirm the decision of the district court.
In summary, we AFFIRM the district court’s decision that the Bank took a valid security interest in the Debtor’s accounts receivable (section III, supra). We REVERSE AND REMAND the case for a factual determination as to whether the Bank “improved its position” during the ninety-day preference period (section IV, supra). We also REVERSE AND REMAND the case for a factual determination as to the amounts transferred from the AMH of the Greenbelt accounts during the preference period; after such a determination has been made, the district court is directed to enter judgment for the Trustee in that amount (section V, supra). The district court is further directed to enter judgment in the Trustee’s favor for the $52,097.53 collected on warrants after the filing of the bankruptcy petition (section VI, supra). In all other respects the decision of the district court is AFFIRMED.
AFFIRMED in part and REVERSED in part AND REMANDED.

. The Debtor also received payments made by private individuals who did not qualify for governmental benefits, but these "private payments" were normally received in advance, or at least by the tenth of the month in which service was rendered.

. The Loan Agreement stated in part:
1. THE LOAN: The Company agrees to borrow from Bank, and Bank agrees to lend to Company, subject to the terms and conditions of this Agreement, an amount not to exceed 85% of the Company’s accounts receivable as defined herein up to a maximum of $500,000.00 (the "Receivables Loan”). On the Company’s first business day of each successive month (hereinafter referred to as the "Settlement Date"), the Company shall have the right to borrow in amounts determined by the Company, and at other times as needed, provided such advances do not cause the total principal balance outstanding under this paragraph 1 to exceed the maximum amount of $500,000.00.
3. SECURITY.
(a) Security Interest. In consideration of monies advanced to the Company by the Bank, the Affiliated Group will and do hereby grant to Bank a security interest in all accounts, contract rights, general intangibles and rights to payment of every kind now or at any time hereafter arising, directly, or indirectly, out of the operation of health care facilities by the Affiliated Group in the ordinary course of business of the Affiliated Group or rights to payment of every kind now or hereafter arising out of the business of the Affiliated Group. Such security interest shall be granted and perfected by the execution of instruments requested by the Bank.
(emphasis added).

. AMH of the Greenbelt, Inc. was not among those listed, and the Loan Agreement was not signed by an officer of that corporation. See section V. infra.

. The Security Agreement for the $500,000 line of credit provided that a security interest was granted in the following collateral:
All accounts receivable due under the Nursing Homes Vendor-Vendee Programs payable through the Texas Department of Human Resources, Medicaid, Medicare, and private pay accounts receivables.

. The Security Agreement for the $350,000 loan provided that a security interest was granted in the following collateral:
All accounts, contract rights, chattel paper, instruments, general intangibles and rights to payment of every kind now or at any time hereafter arising out of the business of the debtor; all interest of the debtor in any goods, the sale or lease of which shall have given or shall give rise to any of the foregoing; the above to include cost report reimbursements from Mutual of Omaha, National Health Insurance Corporation, and Blue Cross-Blue Shield of Texas.

. An examination of the legislative history of this provision reveals that its purpose was to prevent “factoring” agencies from purchasing medicare and medicaid accounts receivable at a discount and then serving as the collection agency for the accounts. Congress was concerned that direct payment of funds to these factoring agencies was resulting in "incorrect and inflated claims.” See H.R.Rep. No. 231, 92d Cong., 2d Sess., reprinted in 1972 U.S.Code Cong. & Ad.News 4989, 5090; H.R.Rep. No. 393, 95th Cong., 1st Sess. 48-49, reprinted in 1977 U.S.Code Cong. & Ad.News 3039, 3051-52; Danvers Pathology Associates, Inc. v. Atkins, 757 F.2d 427, 430 (1st Cir.1985); Michael Reese Physicians & Surgeons v. Quern, 606 F.2d 732, 734, 735 (7th Cir.1979).

. The bankruptcy court specifically found that "there is no evidence whatsoever that the bank was acting as a factor. As far as the evidence reflects the bank provided a line of credit on a dollar-for-dollar basis, with no discount or no added fee other than the proper interest charged for the financing.” Memorandum and Order at 16.

. Cf. Memorandum and Order at 16 ("The warrant issued by the cognizant officer of the state agency in effect remained an account receivable ... it merely was the written acknowledgment of the state that a sum certain was owed, but in its form as a warrant it was non-negotiable.”).

. See Jackson, Avoiding Powers in Bankruptcy, 36 Stan.L.Rev. 725, 768 & n. 128 (1984) (citing cases); In re Auto-Train Corp., 49 B.R. 605, 610 (D.D.C.1985); In re Fitzgerald, 49 B.R. 62, 65 (D.Mass.1985).

. See Jackson, supra, 36 Stan.L.Rev. at 774-75 ("A bright line rule thus has supplanted a standard requiring a case-by-case analysis.”); Clark, Preferences Under the Old and New Bankruptcy Acts, 12 U.C.C.L.J. 154, 178-79 (1979):
The court will look only at the beginning and end points of the ninety-day period; interim variations must be ignored. For example, the rule would allow the debtor to prefer a secured creditor whose level of inventory or accounts collateral was high ninety days before bankruptcy but had fallen down since then by raising the level again shortly before bankruptcy____ Conversely, the rule could penalize creditors of a business that has a cyclical flow of inventory; if the low point happened to fall ninety days before bankrupt *760 cy, such creditors could be hurt by the "bright line" established in the rule.

. See S.Rep. No. 989, 95th Cong., 2d Sess. 88, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5874:
A creditor with a security interest in a floating mass, such as inventory or accounts receivable, is subject to preference attack to the extent he improves his position during the 90-day period before bankruptcy. The test is a two-point test, and requires determination of the secured creditor’s position 90 days before the petition and on the date of the petition.
H.R.Rep. No. 595, 95th Cong., 1st Sess. 216 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6176:
What has been referred to as a "two point measurement system” is set up____ If the transferee is better off ("has improved his position") on the second date them he was on the first date, there is, pro tanto, a preference. "Improvement of position" is defined (second sentence) as the reduction of a “deficiency or its conversion into a surplus between the two dates____ Unless there is a deficiency (i.e:, the loan is under-collateralized) on the first date, there can be no preference under the Draft. Intervening fluctuations in the relationship between debt and collateral during the ... period are ignored.
See also Nimmer, Security Interests in Bankruptcy: An Overview of Section 547 of the Code, 17 Hous.L.Rev. 289, 318-19 (1980); Clark, supra, 12 U.C.C.LJ. at 178-79; Mann & Phillips, Floating Liens as Preferenctial Transfers Under the Bankruptcy Reform Act, 85 Comm.L.J. 7, 14-15 (1980).

. These calculations apparently do not take into account the amount outstanding ninety days prior to bankruptcy on the Debtor’s separate $350,000 loan, which was also secured by the Debtor’s accounts receivable; inclusion of that amount would make the Bank’s improvement in position correspondingly greater, since a substantial repayment on this loan appears to have been made during the preference period. See Appellant’s Brief at 9, 35-36; Plaintiffs Exhibit 72.

. See Duncan, Preferential Transfers, the Floating Lien, and Section 547(c)(5) of the Bankruptcy Reform Act of 1978, 36 Ark.L.Rev. 1, 22 (1982):
[F]irst, calculate the collateral deficiency as of the date ninety days before bankruptcy; second, calculate the collateral deficiency as of the date of the filing of the bankruptcy petition; and third, calculate the amount of the reduction in collateral deficiency by subtracting the product of the second calculation from the product of the first calculation. The figure resulting from this arithmatic process designates the maximum extent of the trustee’s power to avoid a security interest in inventory or receivables under section 547(b).
(footnote omitted).

. See H.R.Rep. No. 595, 95th Cong., 1st Sess. 216 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5963, 6176:
The comparison of values at the two measuring points which the Draft requires poses problems of obvious difficulty. A statutory valuation formula would have been helpful. The Committee has considered a number of suggested formulas but has been unable to come up with a satisfactory one. The valuation problem is, therefore, left to the referees and judges.

. See, e.g., Cohen, “Value" Judgements: Accounts Receivable Financing and Voidable Preferences Under the New Bankruptcy Code, 66 Minn.L.Rev. 639, 654-65 (1982) (discussing five alternatives).

. The Bank here confuses attachment of a security interest with perfection against the Trustee. See Tex.Bus. & Com.Code § 9.305, When Possession by Secured Party Perfects Security Interest Without Filing, Comment 1 (expressly excluding “accounts,” which may be perfected “only by filing”); cf. 11 U.S.C. § 544(a) (trustee as lien creditor); Tex.Bus. & Com.Code § 9.301 (trustee in bankruptcy as lien creditor with priority over holders of unperfected security interests). If the Bank’s response is that it "perfected by possession” only its interest in the proceeds of the accounts, see Appellee’s Brief at 6-7, then that argument fails under Tex.Bus. & Com.Code § 9.306 (requiring that security interest in original collateral be perfected).