# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-10274

United States Court of Appeals
Fifth Circuit

**FILED**
January 28, 2016

Lyle W. Cayce
Clerk

In Re:  TUSA-EXPO HOLDINGS, INCORPORATED,

>  Debtor

MARILYN D. GARNER,

>  Appellant

v.

KNOLL, INCORPORATED,

>  Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before SMITH, WIENER, and GRAVES, Circuit Judges.

WIENER, Circuit Judge:

This adversary action was brought by Appellant Marilyn D. Garner (the "Trustee") against Appellee Knoll, Incorporated ("Knoll"). Specifically, the Trustee seeks to avoid transfers from Tusa Office Solutions, Incorporated ("Tusa Office"), the debtor, to Knoll, its creditor, as preferences under § 547 of the Bankruptcy Code.

## FACTS & PROCEEDINGS

### I.    FACTS[1]

For many years, Tusa Office was the largest retail dealer in new furniture manufactured by Knoll. Tusa Office and Knoll's relationship was embodied in several contractual arrangements, only one of which is relevant here. Under it, (1) a customer would order furniture from Tusa Office, (2) Tusa Office would then order that furniture from Knoll, (3) Knoll would deliver the furniture to Tusa Office, (4) Tusa Office would deliver the furniture to the customer and install it, (5) Tusa Office would invoice the customer, (6) the customer would pay Tusa Office, and (7) Tusa Office would pay Knoll. This arrangement was initially governed by an April 30, 2002, Payment Agreement between Tusa Office and Knoll. Under that agreement, Tusa Office granted Knoll a first-priority security interest in, among other things, all of its present and after-acquired assets, including its accounts receivable.

In 2005, Tusa Office acquired Office Expo, Incorporated ("Office Expo"), a dealer in used furniture. After a reorganization, Tusa Office and Office Expo became wholly-owned subsidiaries of Tusa-Expo Holdings, Incorporated. Although Tusa Office continued to operate profitably, Office Expo did not. To bolster Office Expo's flagging performance, Tusa Office began to transfer funds to Office Expo regularly, which caused Tusa Office problems of its own.

---

[1] We rely on the findings of fact in the bankruptcy court's opinion. *Thibodeaux v. Olivier* (*In re Olivier*), 819 F.2d 550, 552 (5th Cir. 1987) ("In bankruptcy proceedings, [this court] review[s] findings of fact—including those based on credibility determinations, on physical and documentary evidence, and on inferences from other facts—under the clearly erroneous standard."); *see* FED. R. BANKR. P. 7052. ("[Federal Rule of Civil Procedure 52] applies in adversary proceedings . . . ."); FED. R. CIV. P. 52(a)(1) ("In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.").

Tusa Office and Knoll eventually entered into an Amended Payment Agreement (the "APA") in June 2008, which restructured Tusa Office's debt to Knoll. Under the APA, Tusa Office's current indebtedness to Knoll (that is, the part of its debt that was more than 90 days old) could not exceed $3.1 million until its past-due indebtedness (that is, the part of its debt that was more than 90 days old) was less than $1.9 million. The APA again granted Knoll a first-priority security interest in substantially all of Tusa Office's present and after-acquired assets, including its accounts receivable. When Tusa Office and Knoll entered into the APA, Tusa Office's current indebtedness to Knoll was $2,863,898.60 and its past-due indebtedness was $2,703,955.29.23.

In addition to restructuring its debt to Knoll, Tusa Office obtained financing from Textron Financial, Incorporated ("Textron"). Specifically, Tusa Office and Textron entered into an agreement (the "Loan Agreement") in July 2009, under which Textron provided Tusa Office with a $6.5 million revolving loan in exchange for a first-priority security interest in all of Tusa Office's current and after-acquired assets, including Knoll's collateral. The Loan Agreement also required Tusa Office to have its customers make payments directly to a bank deposit account (the "lockbox") that was controlled by Textron.

As a condition precedent to the Loan Agreement, Textron and Knoll entered a separate Subordination Agreement, under which Knoll retained a first-priority security interest in specified accounts receivable of Tusa Office and a second-priority security interest in all other current and after-acquired assets of Tusa Office. With the exception of those specified accounts receivable, Textron received a first-priority security interest in all remaining current and after-acquired assets of Tusa Office. Textron and Knoll subsequently entered an Amended Subordination Agreement.

3

Under these several agreements, Tusa Office's accounts receivable were paid directly into the lockbox by its customers. Having control of the lockbox, Textron withdrew the deposited funds daily and applied them to increase the available credit to Tusa Office on its revolving loan. On request, Textron would advance new revolving loan funds to Tusa Office's operating account. Tusa Office used those funds to, among other things, pay Knoll. By paying Knoll, Tusa Office reduced its indebtedness under the APA, allowing it to fill new orders from its customers.

## II.    PROCEEDINGS

### A.    BANKRUPTCY COURT

In November 2008, Tusa Office filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Shortly thereafter, Knoll filed its proof of claim in the amount of $6,929,783.87. In July 2009, the bankruptcy court granted Tusa Office's motion to convert its Chapter 11 petition for reorganization to a Chapter 7 petition for liquidation.

In November 2010, the Trustee filed a complaint, initiating this adversary action. She sought to avoid as preferences $4,592,483.90.55 in transfers made by Tusa Office to Knoll during the 90-day preference period, pursuant to 11 U.S.C. § 547(b). The bankruptcy court bifurcated the first and second counts of the adversary action in April 2012, then tried those counts over nine nonconsecutive days between August 2012 and January 2013. The next month, Knoll filed a motion for leave to amend its answer to assert an exception under § 547(c) as a new affirmative defense to the first count. The Trustee filed a response. Following a hearing, the court issued an order granting Knoll's motion, and the amended answer was entered into the record.

The bankruptcy court issued its findings of fact and conclusions of law in August 2013. It entered its final judgment on the first count a year later. The

4

Trustee then filed a timely notice of appeal in the bankruptcy court and, in the following days, filed an amended notice of appeal, but only sought review of the judgment on the first count.

B.     DISTRICT COURT

In March 2015, the district court issued its order and judgment, affirming the bankruptcy court. Although the parties had raised other issues, the district court stated that "nothing would be gained by a discussion of any of the issues the parties say are presented by this appeal other than the § 547(c)(5) issues." Specifically, it concluded that the bankruptcy court had not abused its discretion in granting Knoll's motion to amend its answer and that it had not erred in concluding alternatively that, even if the transfers were preferences, Knoll had established that the exception to avoidance under § 547(c)(5) applied. Later that month, the Trustee timely filed notice of appeal to this court.

## ANALYSIS

### I.     STANDARD OF REVIEW

We review the bankruptcy court's findings of fact and conclusions of law "under the same standards employed by the district court hearing the appeal from bankruptcy court; conclusions of law are reviewed *de novo*, findings of fact are reviewed for clear error, and mixed questions of fact and law are reviewed *de novo*."[2]  "Under a clear error standard, this court will reverse only if, on the entire evidence, we are left with the definite and firm conviction that a mistake

---

[2] *Century Indem. Co. v. NGC Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 504 (5th Cir. 2000); *see Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 152 (5th Cir. 2015) ("This court reviews the bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*.").  The bankruptcy court's order granting Knoll leave to amend, which we do not review, is subject to a different standard of review. *See Deere & Co. v. Johnson*, 271 F.3d 613, 621 (5th Cir. 2001).

has been made."[3] "Strict application of the clearly erroneous rule is particularly important where, as here, the district court has affirmed the bankruptcy judge's findings."[4]

## II.    THE REQUIREMENTS OF § 547(B)

### A.    THE VARIOUS ANALYSES

The Trustee complains that the bankruptcy court erred in holding that the transfers from Tusa Office to Knoll were not preferences under § 547(b) of the Bankruptcy Code. Section 547(b) specifies, in the conjunctive:

> [T]he trustee may avoid any transfer of an interest of the debtor in property—
>
> (1)    to or for the benefit of a creditor;
>
> (2)    for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3)    made while the debtor was insolvent;
>
> (4)    made . . . on or within 90 days before the date of the filing of the petition [*viz.*, the preference period] . . . ; and
>
> (5)    that enables such creditor to receive more than such creditor would receive if—
>
> > (A)    the case were a case under chapter 7 of this title;
> >
> > (B)    the transfer had not been made; and
> >
> > (C)    such creditor received payment of such debt to the extent provided by the [Bankruptcy Code].[5]

---

[3] *Morrison v. W. Builders of Amarillo, Inc.* (*In re Morrison*), 555 F.3d 473, 480 (5th Cir.2009) (internal quotation marks omitted).

[4] *Wilson v. Huffman* (*In re Missionary Baptist Found. of Am., Inc.*), 712 F.2d 206, 209 (5th Cir. 1983).

[5] 11 U.S.C. § 547(b).

If a trustee establishes each of the requirements of § 547(b), the transfer is a preference, which must be returned to the bankruptcy estate unless the creditor establishes an exception to avoidance under § 547(c).[6]

The instant dispute concerns the last of the § 547(b) requirements, namely, subsection (b)(5). "This is the requirement that before a trustee in bankruptcy can [*sic*] avoid a preferential [transfer], the trustee must establish that the [transfer] enabled the creditor to receive more than the creditor would have received upon liquidation under Chapter 7 of the [B]ankruptcy [C]ode."[7]

To determine whether a trustee has established this requirement, a court typically uses the so-called "hypothetical Chapter 7 liquidation analysis" inherent in § 547(b)(5) itself. To do so, the court (1) constructs a hypothetical Chapter 7 liquidation in which the creditor retains the disputed transfers, *viz.*, the transfers-*retained* hypothetical, and (2) constructs another in which the creditor returns those transfers, *viz.*, the transfers-*returned* hypothetical. To establish the requirement of § 547(b)(5) under this analysis, the sum of (1) the disputed transfers and (2) the creditor's distribution in the transfers-retained hypothetical must be "more" than the creditor's distribution in the transfers-returned hypothetical.

---

[6] *Krafsur v. Scurlock Permian Corp.* (*In re El Paso Refinery*)*,* 171 F.3d 249, 253 (5th Cir. 1999); *see* 11 U.S.C. § 547(g) ("For the purposes of [§ 547], the trustee has the burden of proving the avoidability of a transfer under [§ 547(b)], and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under [§ 547(c)]."). In addition to the requirements enumerated in § 547(b)(1) through § 547(b)(5), there is an unenumerated requirement in § 547(b) itself that such a transfer must have been made from "an interest of the debtor in property." That is, to be avoidable, the transfer must have diminished the debtor's estate. Because we hold that the trustee has not established another of the requirements of § 547(b), we do not consider the unenumerated requirment.

[7] *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1034 (5th Cir. 1987); *see* 11 U.S.C. § 547(b)(5).

But a court may occasionally circumvent the often arduous hypothetical Chapter 7 liquidation analysis by employing the abbreviated *El Paso Refinery* analysis.[8] This analysis considers only the disputed transfer itself. It is premised on the truism that, if a creditor receives a transfer which, by its very nature, would not have been available to any of the other secured or unsecured creditors, it could never receive "more" under the hypothetical Chapter 7 liquidation analysis.[9] Specifically, the *El Paso Refinery* analysis states:

> To determine whether an undersecured creditor received a greater percentage recovery [*read*: "more"] on its debt than it would have under [C]hapter 7 the following two issues must first be resolved: (1) to what claim the [transfer] is applied and (2) from what source the [transfer] comes. Both aspects must be examined before the issue of greater percentage recovery can be decided.[10]

These are referred to as the *application* aspect and the *source* aspect, respectively.

If the disputed transfer (1) reduced the creditor's collateral under the application aspect of the *El Paso Refinery* analysis *or* (2) was made from the debtor's collateral under the source aspect of that analysis, the trustee could never establish that the creditor received "more" under the hypothetical Chapter 7 liquidation analysis. But only in such an instance is the *El Paso Refinery* analysis dispositive. If, conversely, the disputed transfer (1) did *not* reduce the creditor's collateral under the application aspect *and* (2) was *not* made from the debtor's collateral under the source aspect, the trustee might

---

[8] *El Paso Refinery*, 171 F.3d at 253.

[9] *See, e.g.*, *Missionary Baptist*, 796 F.2d at 759 ("It is a commonplace that preference law exempts fully secured creditors from its grasp.").

[10] *El Paso Refinery,* 171 F.3d at 254 (citation omitted).

8

still be able to establish that the creditor received "more" under the hypothetical Chapter 7 liquidation analysis.  Simply put, the *El Paso Refinery* analysis provides a threshold. It is intended to aid the hypothetical Chapter 7 liquidation analysis under § 547(b)(5), not to replace it. Nor could it. As the hypothetical Chapter 7 liquidation analysis is embodied in § 547(b)(5), it must control.

Here, in a belt-and-suspenders approach, the bankruptcy court undertook both the *El Paso Refinery* analysis and the hypothetical Chapter 7 liquidation analysis. It began by determining that the Trustee had failed to establish the requirement of § 547(b)(5) under the *El Paso Refinery* analysis because she had not satisfied the source aspect.[11] Although it did not need to have done so, the bankruptcy court went on to determine that the Trustee had also failed to establish the requirement of § 547(b)(5) under the hypothetical Chapter 7 liquidation analysis: Even if the transfers had not been made from Knoll's collateral, Knoll still did not receive "more."

The district court did not use either analysis, however. Instead it determined that, even if the Trustee had established all of the requirements of § 547(b), Knoll itself had established an exception to avoidance under § 547(c)(5).

B.    THE *EL PASO REFINERY* ANALYSIS

We begin, as did the bankruptcy court, with the *El Paso Refinery* analysis. The Trustee contends that the bankruptcy court erred in deciding that the Trustee did not satisfy the source aspect of the *El Paso Refinery* analysis. This analysis specifies that "[e]ven if the [transfer] in question was

---

[11] The parties do not appear to dispute that the trustee established the application aspect of the analysis because the transfers from Tusa Office to Knoll did not reduce Knoll's collateral.

9

applied to the unsecured portion of an undersecured creditor's claim, the creditor will not be deemed to have received a greater percentage [*read:* "more"] as a result of the [transfer] if the source of the [transfer] is the creditor's own collateral."[12] Accordingly, "[a] creditor who merely recovers its own collateral receives no more as a result than it would have received anyway had the [transfer] been retained by the debtor, subject to the creditor's security interest."[13]

The Trustee asserts that the transfers from Tusa Office to Knoll were not made from the proceeds of Knoll's collateral. Knoll disputes this. We note that "[p]roperty interests are created and defined by state law" and that, "[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."[14] "It is [therefore] common in the bankruptcy context to look to state law to define security interests created under state law."[15] The parties do not contest the applicability of state law, here that of Texas.

Texas has adopted the Uniform Commercial Code ("UCC"), which governs this dispute.[16] The term "proceeds" is defined under § 9.102 of the UCC as including "whatever is acquired upon the sale, lease, license, exchange, or

---

[12] *El Paso Refinery,* 171 F.3d at 254–55; *see* 5 COLLIER ON BANKRUPTCY ¶ 547.09 (16th ed. 2009).

[13] *El Paso Refinery,* 171 F.3d at 254–55; *see* 5 COLLIER ON BANKRUPTCY ¶ 547.09.

[14] *Butner v. United States,* 440 U.S. 48, 55 (1979).

[15] *Ford Motor Credit Co., LLC v. Dale* (*In re Dale*), 582 F.3d 568, 573 (5th Cir. 2009).

[16] *See* TEX. BUS. & COM. CODE ANN. § 1.101 ("This title [the Texas Business and Commercial Code] may be cited as the Uniform Commercial Code."); *Coburn Supply Co. v. Kohler Co.,* 342 F.3d 372, 376 (5th Cir. 2003) ("Texas has adopted the UCC . . . .").

other disposition of collateral."[17] Under § 9.315, "a security interest attaches to any identifiable proceeds of collateral."[18] Further, "[a] security interest in [those] proceeds is a perfected security interest if the interest in the original collateral was perfected."[19] Knoll had a first-priority security interest in Tusa Office's accounts receivable, so they were Knoll's first-priority collateral. By extension, Knoll's first-priority collateral included both the accounts receivable and any proceeds of those accounts receivable.[20] To determine whether the Trustee satisfied *El Paso Refinery*'s source aspect, we must consider whether those accounts receivable and proceeds remained Knoll's collateral after being transferred (1) first into the lockbox by Tusa Office's customers, then (2) out of the lockbox by Textron, and finally (3) by Textron to Tusa Office's operating account.

### 1. TRANSFERS FROM TUSA OFFICE'S CUSTOMERS INTO THE LOCKBOX

The Trustee does not dispute that the payments Tusa Office's customers deposited into the lockbox were proceeds of Tusa Office's accounts receivable. She argues instead that, because this constituted a transfer of *money*, Knoll's first-priority security interest in the payments was "stripped" by operation of § 9.332(a): "A transferee of money takes the money free of a security

---

[17] TEX. BUS. & COMM. CODE ANN. §§ 9.102(65), 9.102(65)(a).

[18] *Id.* § 9.315(a)(2).

[19] *Id.* § 9.315(c).

[20] Knoll also had a second-priority security interest, after Textron's first-priority security interest, in Tusa Office's "now existing and hereafter acquired or arising Accounts, . . . Receivables, General Intangibles, Payment Intangibles, Deposit Accounts, . . . Letters of Credit, Letter-of-Credit Rights, advices of credit, money, . . . together with all products of and Accessions to any of the forgoing, and all Proceeds of any of the forgoing . . . ." These things constituted Knoll's second-priority collateral. This second-priority collateral is not relevant to the *El Paso Refinery* analysis.

11

interest . . . ."[21] The comments explain that "the debtor itself is not a transferee,"[22] meaning that § 9.332(a) does not apply if such a transfer of money was made to the debtor. The Trustee therefore insists that Textron, not Tusa Office, was the transferee. In so doing, the Trustee contends that the lockbox was "owned and controlled by Textron."

Knoll disputes this contention. Specifically, Knoll explains that (1) the deposit by Tusa Office's customers into the lockbox corresponded with reductions in Tusa Office's accounts receivable and (2) the transfers out of the lockbox to Textron corresponded with reductions in Tusa Office's debt to Textron under the revolving loan. Knoll also observes that the bankruptcy court never expressly found that Textron *owned* the lockbox. The Trustee counters that Tusa Office's former controller testified that the lockbox "belonged to Textron" and that there is no reference to the lockbox in Tusa Office's bankruptcy schedules.

Regardless of the Trustee's and Knoll's competing assertions, the Loan Agreement is clear. It specifies that "[*Tusa Office*] shall utilize a lockbox arrangement for collection of Accounts at a bank designated by [Textron] . . . ." and, as a condition precedent to the Loan Agreement, "[*Tusa Office*] shall have established a blocked account or lockbox . . . for its collections and the transfer thereof to [Textron] . . . ." The Loan Agreement also states that "[*Tusa Office*] shall have possession of [Textron's] Collateral" and "will cooperate with and assist [Textron] in obtaining control . . . with respect to [c]ollateral consisting of . . . Deposit Accounts . . . ."

---

[21] TEX. BUS. & COMM. CODE ANN. § 9.332(a).

[22] *Id.* § 9.332, cmt. 2.

Because Tusa Office, not Textron, owned the lockbox, § 9.332(a) does not apply. Therefore, Knoll's first-priority security interest in the proceeds of Tusa Office's accounts receivable survived the deposit into the lockbox.

### 2.    TRANSFERS FROM THE LOCKBOX TO TEXTRON

The Trustee next contends that Knoll's first-priority security interest in the proceeds of Tusa Office's accounts receivable, initially paid into the lockbox, did *not* then transfer from the lockbox to Textron. She states specifically that § 9.332(b) of the UCC stripped Knoll's first-priority security interest when they were transferred from the lockbox to Textron.

Knoll responds that § 9.332(b) only concerns a security interest in the deposit account itself, not a security interest in the funds contained in it. Accordingly, Knoll insists that, even though § 9.332(b) would have prevented a security interest in the lockbox itself from transferring, it did not prevent the transfer of Knoll's first-priority security interest in the proceeds of its collateral.

The plain language of § 9.332(b) states that a "transferee of funds from a deposit account takes the funds free of a security interest *in the deposit account*."[23] Although § 9.332(a)—which applies to transfers of "money"—and § 9.332(b)—which applies to transfers of "funds"—are similar, they are not identical.[24] Specifically, § 9.332(a) provides that "[a] transferee of money takes

---

[23] *Id.* § 9.332(b) (emphasis added).

[24] As used in the UCC, "money" and "funds" are not synonymous. The UCC defines "money" as "a medium of exchange currently authorized or adopted by a domestic or foreign government." *Id.* § 1.201(24). As the comments to § 9.201 explain: "'[M]oney' is limited essentially to currency . . . . '[F]unds' is a broader concept (although the term is not defined [by the UCC])." *Id.* § 9.201, cmt. 5. The comments to § 9.332 explain that "[a] transfer of funds . . . , to which [§ 9.332(b)] applies, normally will be made by check, by funds transfer, or by debiting the debtor's deposit account and crediting another depositor's account." *Id.* § 9.332, cmt. 2.

13

the money free of *a [read: any] security* interest."[25] By contrast,  § 9.332(b) provides that "[a] transferee of funds from a deposit account takes the funds free of *a security interest in the deposit account . . . .*"[26]  This difference must have been intentional. The drafters could have specified, but did not, that "a transferee of funds from a deposit account takes the funds free of a [*read:* any] security interest" as they did in § 9.332(a). Or they could have specified that "a transferee of funds from a deposit account takes the funds free of a security interest *in the funds themselves.*" The comments to § 9.332 bolster this distinction between a deposit account itself and the funds contained in it. In particular, the comments explain that § 9.332(b) "applies to *transfers of funds from* [a] deposit account" but "does not apply to *transfers of the deposit account* itself or of [a security] interest therein."[27] (Of course, the question whether § 9.332(b) applies is distinct from the subsequent question whether § 9.332(b) then strips a particular security interest.)

The comments to § 9.332 further explain that "[b]road protection for transferees helps to ensure that security interests in deposit accounts do not impair the free flow of funds."[28] It is clear to us that § 9.332(b) ensures that the *funds* in a deposit account remain unencumbered by a security interest in the deposit account itself. Section 9.332(b) does not even address, must less strip, a security interest that encumbers the funds contained in the deposit account. Stated simply, § 9.332(b) protects Knoll from Textron's first-priority security interest in the deposit account; it does not, however, protect Textron from Knoll's first-priority security interest in the funds contained in that account.

---

[25] *Id.* § 9.332(a) (emphasis added).

[26] *Id.* § 9.332(b) (emphasis added).

[27] *Id.* § 9.332, cmt. 2 (emphasis in original).

[28] *Id.* § 9.332, cmt. 3.

Because § 9.332 is a recent addition to the UCC, the jurisprudence interpreting it is scarce. Nevertheless, the Trustee and Knoll each proffer cases to support their respective positions.[29] Knoll relies on *Madisonville State Bank v. Canterbury*, in which a state appeals court held that § 9.332 strips the security interests in the deposit account itself but not the security interest in the funds in it.[30] By contrast, the Trustee notes that this holding was disregarded as "unsound" by a federal district court in *City Bank v. Compass Bank*, which determined that § 9.332 strips the security interest from both the deposit account and the funds in it.[31] But, in doing so, that court disregarded the plain language of § 9.332 in favor of the comments. It reasoned that the *comments* to § 9.332 "specifically define[ ] encumbered accounts as being not only those subject to a  direct security interest [in] the account itself, but also 'deposit accounts containing collections from accounts receivable.'"[32]

---

[29] Knoll also relies on a district court's decision in *Western National Bank v. United States*, which held that funds deposited by a debtor's customers into a lockbox remained subject to a security interest. *W. Nat'l Bank, Odessa v. United States*, 812 F. Supp. 703, 706 (W.D. Tex. 1993) ("[T]he corresponding receivable was immediately impressed with the [federal] tax lien. Therefore, the lien followed the payments into the lockbox and could not be severed. . . . Although [the debtor] could no longer physically obtain the funds once they passed into the lock box, it still had an interest in the funds. The funds were payments from [the debtor's] customers. Such funds were credited to [the debtor's] account with [its creditor]. If a customer failed to pay, [the debtor] had a legal remedy to ensure payment. Moreover, if [the creditor] removed the funds and did not apply the proceeds to [the debtor's] account, [the debtor] would have a cause of action against [the creditor] for misappropriation of funds. Thus, . . . [the debtor] had a sufficient interest in the funds deposited in the lock box for the [federal tax] lien to attach."). But this holding was premised on federal law: "under the Treasury Regulations, property subject to a federal tax lien which has been sold or otherwise transferred by the taxpayer may be seized while in the hands of the transferee or any subsequent transferee." *Id.* It is therefore inapposite.

[30] 209 S.W.3d 254, 258 (Tex. Ct. App. 2006).

[31] 717 F. Supp. 2d 599, 616 (W.D. Tex. 2010).

[32] *City Bank*, 717 F. Supp. 2d at 616-17 (quoting TEX. BUS. & COMM. CODE ANN. § 9.332, cmt. 3.)

15

But this so-called "explicit statement of legislative intent" is nothing of the sort. In context, the comments merely explain that § 9.332 is justified because "payments of funds from encumbered deposit accounts (e.g., deposit accounts containing collections from accounts receivable) occur with great regularity."[33] This simply suggests that transfers of funds from deposit accounts, "including deposit accounts containing collections from accounts receivable," are taken "free of a security interest in the deposit account." *City Bank*'s assertion, which may very well be dicta, [34] is incorrect. In any event, it does not bind us.

The plain language of § 9.332(b) is unambiguous. Knoll's first-priority security interest in the proceeds of Tusa Office's accounts receivable survived the transfer from the lockbox to Textron. Not only is this consistent with § 9.332(b), but it is also consistent with the Subordination Agreement between Knoll and Textron.[35]

---

[33] TEX. BUS. & COMM. CODE ANN. § 9.332, cmt. 3.

[34] Ultimately, the district court "decline[d] to decide this uncertain point of state law" after remarking that "there [we]re adequate alternative grounds to decide the overall issue of conversion . . . ." *City Bank*, 717 F. Supp. 2d at 616-17.

[35] Neither party addresses the applicability of § 9.339, which provides that § 9.332 "does not preclude subordination by agreement by a person entitled to priority." TEX. BUS. & COMM. CODE ANN. § 9.339. As the comments to § 9.339 explain: "The preceding sections [including § 9.332] deal elaborately with questions of priority. This section [§ 9.339] makes it entirely clear that a person entitled to priority may effectively agree to subordinate its claim. Only the person entitled to priority may make such an agreement: a person's rights cannot be adversely affected by an agreement to which the person is not a party." Notably, the comments to § 9.332 further provide that "[§ 9.332] sets forth the circumstances under which certain transferees of money or funds take free of security interests. It does not determine the rights of a transferee who does not take free of a security interest." It is clear to us, as it was to the bankruptcy court, that Textron and Knoll did not intend for Knoll's first-priority security interest to be preserved only to be destroyed by § 9.332(a) or § 9.332(b).The Loan Agreement between Textron and Tusa Office provides that "[Tusa] has a perfected first priority security interest in the Collateral and the Collateral is free of any lien, encumbrance or adverse interest of any kind whatsoever, with the exception of . . . liens permitted under the terms of [the Subordination Agreement with Knoll]."

16

### 3.    TRANSFERS FROM TEXTRON TO TUSA OFFICE

The Trustee also urges that, even if Knoll's first-priority security interest in the proceeds of Tusa Office's accounts receivable did survive the transfer into and out of the lockbox, it did not survive the transfer from Textron to Tusa Office's operating account. Specifically, the Trustee insists that the proceeds were commingled. Knoll responds that, unless the Trustee establishes that the proceeds were commingled, they are presumed to be identifiable. Knoll suggests that the Trustee never established, and the bankruptcy court never found, that the funds transferred by Textron into Tusa Office's operating account were commingled.

As a preliminary matter, § 9.315(b)(2) of the UCC specifies that "[p]roceeds that are commingled with other property are identifiable proceeds . . . to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under law . . . ."[36] Knoll argues that § 9.315(b)(2)'s requirement that "the *secured party* identif[y] the proceeds by a method of tracing"[37] is inconsistent with the § 547(g)'s instruction that "the *trustee* has the burden of proving the avoidability of a transfer under [§ 547(b)]."[38] Knoll relies on *Batlan v. TransAmerica Commercial Finance Corp. (In re Smith's Home Furnishings, Inc.),*[39] in which the Ninth Circuit explained that "it is part of the trustee's § 547(b)(5) burden to trace the funds used to make the payments to [funds] not

---

[36] TEX. BUS. & COMM. CODE ANN. § 9.315(b)(2).

[37] *Id.* § 9.315(b)(2) (emphasis added).

[38] 11 U.S.C. § 547(g) (emphasis added).

[39]  265 F.3d 959, 967 (9th Cir. 2001).

subject to [the creditor's] liens."[40] In so doing, that court observed that "in bankruptcy, it is the trustee who accedes to the debtor's books and records and has easier access and a better ability to divine the financial activities of the debtor in its last months of operation." The *Smith's* court also clarified that, "[r]egardless of [whether the creditor or trustee] is better equipped to decipher the debtor's final financial actions, we hold that the language of [§ 547(g)] places the burden of demonstrating the source of such preferential payments squarely on the trustee."[41]

The Trustee responds that this was merely dicta because the Ninth Circuit had already held that the debt owed to the creditor was completely secured, so the transfer could not be a preference. This, however, ignores the Ninth Circuit's clear signal to the contrary, *viz.*, "we hold." It also ignores the fact that the Ninth Circuit relied on the same reasoning for its holdings that (1) the creditor was completely secured and (2) the trustee had the burden of tracing. In deciding that the debt owed to the creditor was completely secured, the Ninth Circuit explained: "Under § 547(b)(5), the trustee must show that the amount of indebtedness under the floating lien was greater than the amount of collateral . . . . A floating lien does not shift the burden of showing avoidability to the creditor. The trustee still has to satisfy his burden under § 547(b)(5)."[42] Thus, the Ninth Circuit's decision in *Smith's* stands for the proposition that a trustee has the burden of showing that the source of any transfers from a debtor to a creditor was not the proceeds of the creditor's

---

[40] *Id.* at 966.

[41] *Id.* at 967.

[42] *Smith's*, 265 F.3d at 965.

collateral. That court's reasoning in this respect is strongly persuasive. The UCC applies "[u]nless some federal interest requires a different result."[43]

The Trustee also suggests that the lockbox arrangement between the lender and debtor in *Smith's* was different from the one between Textron and Tusa Office. She argues expressly that, in *Smith's*, the lender swept the lockbox daily and advanced funds the next day, but that here Textron swept the funds daily, but only advanced funds at Tusa Office's request.

The Ninth Circuit's description of the arrangement in *Smith's* is broad enough to encompass the instant arrangement. There, the court explained that "[the lender] . . . swept the [lockbox] accounts daily, leaving the accounts with overnight balances of zero," that "[t]he next day, the [lender] advanced new funds to [the debtor] if sufficient collateral was available," and that "[the debtor] then paid its operating expenses and creditors . . . ." [44] It observed that, "[b]ecause of these procedures, the allegedly preferential payments . . . were not made directly from the proceeds of the sales of [the creditor's] collateral."[45] The Trustee seems to suggest that, because Tusa Office did not request such transfers each day, and because Textron did not make such transfers each day, the arrangement in *Smith's* is distinguishable. But this is not entirely relevant, especially because the contractual arrangement between Tusa Office and Textron expressly permitted Tusa Office to request funds more frequently than once a day.[46]

---

[43] *Butner*, 440 U.S. at 55.

[44] *Smith's*, 265 F.3d at 961.

[45] *Id.* at 961 n.2.

[46] Specifically, it provides that "[Tusa Office] shall make no more than three (3) requests for Revolving Loans per business day."

Because § 547(g) is clear and *Smith's* is persuasive, we hold that it was the Trustee's burden to establish that the funds in the operating account were not the proceeds of Tusa Office's accounts receivable and that she failed to do so.[47] The definition of "proceeds" in the UCC is broad. It includes "whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral," "whatever is collected on, or distributed on account of, collateral," and "rights arising out of collateral."[48] Absent any reasonable indication to the contrary, it follows that, but for the transfers from the lockbox to Textron, no transfers from Textron to Tusa Office would have been possible. The bankruptcy court did not err in determining that "Tusa Office acquired funds from Textron upon the disposition of Knoll's Collateral."

Because the Trustee did not satisfy the source aspect of the *El Paso Refinery* analysis, testing under the hypothetical Chapter 7 liquidation analysis is unnecessary. The Trustee did not establish the requirement of § 547(b)(5), so we hold that the transfers from Tusa Office to Knoll were not preferences.

### III.    THE EXCEPTION UNDER 547(C)(5)

We would normally stop here without addressing the exception to avoidance under § 547(c)(5). However, the district court went on to consider that exception and to hold that Knoll had established it. As we shall explain, we disagree.

In pertinent part, § 547(c)(5) states that "[t]he trustee may not avoid under [§ 547] a transfer . . . that creates a perfected security interest in

---

[47] The trustee herself states that "tracing is not possible under these circumstances," which seems to be an acknowledgment that, if that burden is hers, she cannot meet it.

[48] TEX. BUS. & COMM. CODE. ANN. § 9.102(65).

inventory or a receivable or the proceeds of either . . . ."[49] As she did in the bankruptcy court and in the district court, the Trustee again argues that the exception under § 547(c)(5) does not apply to the disputed transfers from Tusa Office to Knoll because those transfers did not create any security interest. She also notes that neither the bankruptcy court nor the district court considered whether the transfers created such a security interest.

The Trustee properly distinguishes the Eleventh Circuit's decisions on which the district court relied. In *Galloway v. First Alabama Bank* (*In re Wesley Industries Inc.*), the Eleventh Circuit applied § 547(c)(5) to determine that a debtor's transfer of a perfected security interest in its accounts receivable under a 'floating lien' was not avoidable because the creditor's position had not improved as a result.[50] This allowed that court to use § 547(b)(5) to conclude that a debtor's transfer of the proceeds of the accounts receivable themselves was not a preference because the creditor merely received its own collateral.[51] Although the decision is admittedly vague in its analysis, it did not hold that § 547(c)(5) applies to transfers of accounts receivable themselves. Instead, it expressly states that § 547(c)(5) "*protects the transfer of a security interest* in after-acquired property . . . ."[52]

In *Roemelmeyer v. Walter E. Heller & Co., Southeast, Inc.* (*In re Lackow Brothers, Inc.*), the Eleventh Circuit determined the appropriate method of valuation of under § 547, but it did not consider whether § 547(c)(5) applies to transfers of accounts receivable.[53] Further, § 547(c)(5) could not have applied

---

[49] 11 U.S.C. § 547(c).

[50] 30 F.3d 1438, 14-38-42 (11th Cir. 1994).

[51] *Id.*

[52] *Id.* at 1442 (emphasis added).

[53] 752 F.2d 1529 (11th Cir. 1985).

21

to the transfers there because the creditor was fully secured. As this court has held, "[i]t is . . . commonplace that preference law exempts fully secured creditors from its grasp."[54] We agree with the Trustee that, even if these opinions were binding on us, they are nonetheless inapplicable here.

In response, Knoll relies primarily on this court's decision in *Wilson v. Huffman* (*In re Missionary Baptist Foundation of America, Inc.*) for the proposition that the exception to § 547(c)(5) applies here.[55] In that decision, we discussed the exception under § 547(c)(5) at some length, but remanded without deciding whether it applied to transfers of funds because the district court's analysis was so "conclusory and unilluminating" that we had "no basis for meaningful review at all."[56] Despite this, Knoll advances that *Missionary Baptist* nonetheless held that if, on remand, the district court were to conclude that the creditor had not improved its position, then the transfers would be unavoidable pursuant to the exception under § 547(c)(5).

Regardless, this court's 1986 decision in *Missionary Baptist* and the Eleventh Circuit's 1985 decision in *Lackow* are inapplicable for another, more significant reason. In reciting § 547(c)(5), both courts stated that it applies to a transfer "*of* a perfected security interest in inventory or a receivable or the proceeds of either."[57] Yet, as explained above, § 547(c)(5), as it now exists, applies only to a transfer "*that creates* a perfected security interest in inventory or a receivable or the proceeds of either."[58] The amendment that replaced "of"

---

[54] 796 F.2d at 759.

[55] 796 F.2d at 760-61.

[56] *Id.*

[57] *Id.* at 759 (emphasis added) (quoting 11 U.S.C. § 547(c)(5)); *Lackow*, 752 F.2d at 1530 n.2 (emphasis added) (quoting 11 U.S.C. § 547(c)(5)).

[58] 11 U.S.C. § 547(c)(5) (emphasis added).

with "that creates" was enacted in 1984 and codified in 1985.[59] *Missionary Baptist* and *Lackow* might very well have interpreted the exception under § 547(c)(5) as it then existed to apply to a transfer of accounts receivable themselves and any proceeds thereof. But, as it now exists, the exception under § 547(c)(5) only applies to a transfer that creates a perfected security interest in such things. As we recently held, "the Bankruptcy Code *must* be read literally . . . ."[60] Read literally—as it must be—the exception under § 547(c)(5) does not apply to the transfers at issue here. This does not, however, affect our outcome, which is grounded in the requirement of § 547(b)(5) and the attendant *El Paso Refinery* analysis.

## CONCLUSION

For the forgoing reasons, we hold that the Trustee failed to establish the requirement of § 547(b)(5) because the source aspect of the *El Paso Refinery* analysis demonstrates that the transfer from Tusa Office to Knoll was made from the proceeds of Knoll's own collateral.[61] The judgment of the district court, affirming the bankruptcy court, is AFFIRMED.

---

[59] 98 Stat. 355, 377 (July 10, 1985) (current version at 11 U.S.C. § 547).

[60] *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 246 (5th Cir. 2013) (emphasis in original).

[61] To the extent we address the exception under § 547(c)(5), we do so in dicta. The trustee's failure to establish the requirement of § 547(b)(5) alone is dispositive.