[Cite as *First Fin. Bank v. Tailored Fund Cap, L.L.C.*, 2024-Ohio-4982.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| FIRST FINANCIAL BANK, | : | APPEAL NO. C-230626 |
| | | TRIAL NO. A-2101849 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| | | |
| TAILORED FUND CAP, LLC, | : | |
| | | |
| Defendant-Appellant. | : | |

Civil Appeal From:    Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Reversed and Cause Remanded

Date of Judgment Entry on Appeal: October 16, 2024

*Bricker Graydon LLP, Susan M. Argo, Jeffrey M. Hendricks* and *Austin Z. Baurichter*, for Plaintiff-Appellee*,*

*Durst Kerridge LLC, Alexander J. Durst* and *Paul R. Kerridge*, for Defendant-Appellant.

**KINSLEY, Judge.**

{¶1} This appeal presents an issue of first impression for this court: when there has been no collusion, does R.C. 1309.332(B), a statute that mirrors Section 9-332 of the Uniform Commercial Code ("UCC"), bar recovery for conversion when funds secured by one party's security interest are withdrawn from a deposit account by another party? In keeping with the majority of courts across the country to consider this issue, we answer the question in the affirmative. Both the plain meaning of the statute and the legislative history of UCC 9-332 suggest broad protection for transferees of funds from a deposit account. This reasoned policy decision adopts a preference for finality in financial transactions that we, as a court, are powerless to disturb.

{¶2} As a result, we reverse the decision of the Hamilton County Common Pleas Court awarding summary judgment to plaintiff-appellee First Financial Bank ("FFB") on its claim for conversion against defendant-appellant Tailored Fund Cap, LLC ("TFC"). We remand the cause to the trial court with instructions to dismiss FFB's complaint.

### *Facts and Procedural History*

{¶3} This dispute arises from the collapse of healthcare companies owned by Cincinnati businessman Harold Sosna. Sosna engaged in a costly check-kiting scheme for which he was ultimately convicted of federal crimes.[1] But before his operation was discovered, several entities controlled by Sosna contracted with merchant cash advance ("MCA") companies to sell their accounts receivable. MCAs provide lump-

---

[1] Check kiting is a type of fraud that involves writing a check from one account containing insufficient funds and depositing it into another account. The funds are then used from the second account before the check bounces from the first account. *See, e.g., Kaplan v. Regions Bank*, 2023 U.S. Dist. LEXIS 49770, *3, fn. 2 (M.D. Fl. Mar. 23, 2023).

sum cash advances to businesses in exchange for a set amount of the businesses' future receivables. *See Professional Merchant Advance Capital, LLC v. Care Servs., LLC*, 2013 U.S. Dist. LEXIS 203114, \*2 (S.D.N.Y. Oct. 2, 2013).

{¶4} TFC is one such MCA. According to TFC's owner and managing partner, TFC purchases receivables, finances real estate transactions, and undertakes "almost everything related to financing except traditional mortgages."

{¶5} Sosna also financed his businesses through more conventional means. To this end, his corporations entered into various financial agreements with banking institutions, including FFB.

### A. FFB's relationship to Shining Knight and Wexford

{¶6} In January 2018, MainSource Bank, which later merged with FFB, entered into loan agreements with three Sosna entities: Shining Knight Realty, LLC ("Shining Knight"), Wexford Place, Inc., and Wexford Care Center, Inc. (collectively "Wexford"). Shining Knight was a real estate holding company, and the Wexford entities operated residential care facilities.

{¶7} When MainSource Bank merged with FFB, FFB became a successor in interest to the loan obligations.

### 1. The Shining Knight Agreements

{¶8} Shining Knight's loan obligations to FFB consisted of (1) a January 26, 2018 term note for $12,557,000 and a related loan agreement dated January 26, 2018, and (2) a master agreement dated January 5, 2018. Shining Knight was also obligated to FFB on a January 26, 2018 guaranty, which guaranteed the full and prompt payment of all obligations owed by Wexford to FFB. FFB secured these obligations

through an open-end mortgage, assignment of rents and leases, security agreement, and fixture filing ("Shining Knight mortgage").[2]

{¶9} In that regard, Section 1.1.7 of the Shining Knight mortgage granted FFB a first-priority security interest in:

*all moneys, credits, and other property of any nature whatsoever* of [Shining Knight] now or hereafter in the possession of, in transit to or from, under the custody or control of, or on deposit with (whether held by [Shining Knight] individually or jointly with another) [FFB] or any affiliate of [FFB], including but not limited to cash collateral accounts, construction disbursement accounts and reserve accounts (but excluding fiduciary accounts, if any)[.]

(Emphasis added.)

{¶10} Pursuant to this provision, on January 26, 2018, FFB filed a UCC financing statement with the Ohio Secretary of State to perfect its security interest in Shining Knight's assets.

{¶11} Section 6.1 of the Shining Knight mortgage detailed what would occur in the event Shining Knight defaulted on its loan obligation:

The entire Indebtedness will become due, at the option of [FFB], upon occurrence of an event of default under the . . . Guaranty, Loan Agreement or the Note or upon the failure of the Mortgagor to comply with any term or condition contained in this Mortgage, the Hazardous Substance Indemnity Agreement between [Shining Knight], the Guarantors (as defined in the Mortgagor Loan Agreement) and [FFB] of

---

[2] The Shining Knight mortgage included one amendment dated August 5, 2019.

4

even date herewith, or any other document or agreement entered into between [Shining Knight] and [FFB] in connection with the Loan Agreement, all subject to any applicable notice and cure period, if any (each such occurrence, an "Event of Default").

**{¶12}** Section 3.8 of the Shining Knight mortgage, entitled "Sale, Transfer or Encumbrance," further provided:

Except for personal property *sold in the ordinary course of business*, [Shining Knight] will not, without [FFB's] prior written consent . . . sell or convey, grant a deed of trust, pledge, grant a security interest in, lease, execute a land contract or installment sales contract, or otherwise dispose of, further encumber or suffer the encumbrance of, whether by operation or otherwise, any or all of its interest in the Property.

(Emphasis added.)

### 2. The Wexford Agreements

**{¶13}** Wexford's loan obligations to FFB consisted of a term note for $637,945 and a related loan agreement.[3] Wexford also guaranteed full and prompt payment of all obligations owed by Shining Knight to FFB. FFB secured these obligations through a security agreement dated January 26, 2018.

**{¶14}** Sections 1 and 2 of the Wexford security agreement granted FFB a security interest in the following collateral:

1. All of [Wexford's] Accessions, Accounts, As-Extracted Collateral, Assets, Cash Proceeds, Documents, Inventory, Deposit Accounts, . . .

---

[3] The loan agreement was twice amended, first on November 6, 2018 and then again on August 5, 2019.

Healthcare Receivables . . . and all other personal property and *other assets, of any type*, of [Wexford];

2. All moneys, credits and other property of any nature whatsoever of [Wexford] now or hereafter in the possession of, in transit to or from, under the custody or control of, or on deposit with (whether held by [Wexford] individually or jointly with another and including specifically but not by way of limitation all demand, time, savings, passbook, or other similar accounts) [FFB] or any [FFB] Affiliate, *including but not limited to cash collateral accounts*[.]

(Emphasis added.)

{¶15}  As it did with Shining Knight, FFB filed UCC financing statements with the Ohio Secretary of State on January 26, 2018 regarding its security interest in Wexford's assets.

{¶16}  The Wexford guaranty contained a different restriction on asset transfer from the Shining Knight mortgage.  To that end, section 12 of the Wexford guaranty provided:  "[Wexford] further agrees not to transfer in excess of fifteen percent (15%) of its assets without fair and adequate consideration, unless otherwise agreed to in writing by [FFB]."

### B.  TFC's Merchant Agreements with Shining Knight and Wexford

{¶17}  Following their contracts with FFB, both Shining Knight and Wexford, along with 15 other business entities controlled by Sosna, entered into cash advance agreements with TFC.[4]  Known as factoring agreements, these contracts provided for

---

[4] There were a total of 18 Sosna entities in the transaction:  the 15 unnamed entities, Shining Knight, and the two Wexford entities.

the sale of the entities' future receivables in exchange for a current lump-sum payment.

{¶18} TFC secured its interests in the factoring agreements through a security agreement and guaranty. To this end, the first paragraph of each factoring agreement stated:

Merchant [Shining Knight and Wexford] hereby sells, assigns and transfers to [TFC] *(making [TFC] the absolute owner)* in consideration of the funds provided ("Purchase Price") specified below, *all of [Shining Knight's and Wexford's] future accounts*, contract rights and other obligations arising from or relating to the payment of monies from [Shining Knight's and Wexford's] customers and/or other third party payers (the "Total Gross Receipts") for the payment of [Shining Knight's and Wexford's] sale of goods or services until the amount specified below (the "Purchased Amount") has been remitted from [Shining Knight and Wexford] to [TFC].

(Emphasis added.)

{¶19} Under the first factoring agreement with the 18 Sosna entities, TFC purchased $2,798,000 in future receipts for $2,000,000. Under the second factoring agreement, TFC purchased $1,399,000 in future receipts for $1,000,000. In total, TFC purchased $4,197,000 worth of future receipts for $3,000,000.

{¶20} Both agreements required the 18 entities to deposit 20 percent of their daily receipts into a single account. As a result, the funds that TFC later withdrew came from a comingled account at FFB, which ended in the numbers 7599 and was held in Wexford's name. Between March and May 2020, Shining Knight and Wexford transferred at least $3,644,922 from Wexford's 7599 account to TFC.

7

**{¶21}** TFC paid for the future receipts through a separate entity known as YRB.[5] In three installments, YRB deposited a total of $2,600,002 into the 7599 account, which was less than the contract price of $3 million. TFC's owner provided uncontroverted testimony at a hearing on damages that the shortfall in the purchase price and the installment payments was due to the subtraction of fees provided for by TFC's factoring agreements with the 18 Sosna entities.

### C. Shining Knight and Wexford Defaults

**{¶22}** Sosna's check-kiting scheme came to light in May of 2020. FFB claims that Shining Knight and Wexford defaulted on their loan obligations as a result of his fraud operation, although the bank presented no specific evidence of payment default by these entities.[6]

**{¶23}** In June 2020, FFB brought suit against Shining Knight and Wexford to collect to the remaining balance due under the loan obligations. Around this time, FFB discovered Shining Knight's and Wexford's factoring agreements with TFC. It wrote to TFC demanding that, within ten days, TFC return of "all payments wrongfully received from [Shining Knight and Wexford] . . . in the approximate sum of $3,860,992.00." The letter did not explain the discrepancy between the $3,644,922 TFC withdrew from the 7599 account and the $3,860,992 demand.

**{¶24}** TFC did not pay FFB as demanded. Thus, on May 28, 2021, FFB filed a complaint against TFC for conversion. The complaint sought to recover the funds TFC withdrew from the 7599 account.

---

[5] YRB stands for the initials of TFC's owner.
[6] To the contrary, the evidence in the case reflects that the Shining Knight and Wexford loan balances continued to decline through the duration of the litigation.

### D. FFB's and TFC's Motions for Summary Judgment

{¶25} On January 4, 2022, FFB filed a motion for summary judgment. Whereas its complaint sought the return of the withdrawn funds, FFB's summary judgment motion instead sought approximately $3.1 million rather than $3.6 million in damages. This was based on an altered theory of recovery—that FFB was entitled to the remaining balance on Shining Knight's and Wexford's loans. In its motion, FFB also argued that TFC had actual or constructive knowledge of FFB's first-priority security interest in Shining Knight's and Wexford's accounts receivable by virtue of its UCC filings.

{¶26} FFB's summary judgment motion was supported by an affidavit of FFB's vice president. The affidavit included copies of Wexford's account statements detailing payments made from the 7599 account to TFC.

{¶27} On February 18, 2022, TFC filed a preliminary memorandum in opposition to FFB's motion for summary judgment. In its memorandum, TFC argued R.C. 1309.332(B) precluded FFB's conversion claim. To this end, TFC claimed that it had not colluded with Shining Knight and Wexford to avoid any debt owed by those companies and that, as a result, it was protected as transferee of funds from a deposit account. In doing so, TFC relied on *Cortland Savs. and Banking Co. v. Platinum Rapid Funding Group, Ltd*, 2021-Ohio-461 (11th Dist.), for the proposition that the UCC eliminates any security interest in funds taken from a deposit account.

{¶28} In response, FFB argued that R.C. 1309.332(B) did not bar its conversion claim. It contended that the conversion took place when Shining Knight's and Wexford's receivables were sold, rather than when TFC withdrew funds from the 7599 account. Thus, it argued that TFC's status as a transferee of funds from a deposit account was immaterial to its conversion claim. In other words, FFB contended that

TFC's withdrawal of funds from the 7599 account was the means by which the conversion occurred rather than the conversion itself. Relying on *In re Tusa-Expo Holdings*, 811 F.3d 786 (5th Cir. 2016), FFB argued that if R.C. 1309.332(B) applied, its protections would only strip FFB of its interest in the 7599 account, not the funds contained within the account.

### E. The Trial Court's Summary Judgment Decision in Favor of FFB

{¶29} On January 23, 2023, the trial court granted FFB's motion for summary judgment. It held that the Shining Knight mortgage and the Wexford security agreement granted FFB a first-priority security interest in the assets of both entities. It also held that FFB had established the elements of conversion as a matter of law. But it was not specific as to what action by TFC constituted the conversion—the purchase of the receivables or the withdrawal of funds from the 7599 account.

{¶30} At various points, the trial court implied that both actions might form the basis of the conversion. It described TFC as "obtain[ing] the receivables" in violation of FFB's security interest, suggesting that the conversion occurred when the money transferred hands. But it also favorably cited language from *Fifth Third Bank Cent. Ohio v. Avnet, Inc.*, 2005 U.S. Dist. LEXIS 59361, *15 (S.D. Ohio Oct. 6, 2005), that "a seller can sell only what it owns." And it emphasized that FFB did not consent to the sale of Shining Knight's and Wexford's receivables to TFC. These latter two aspects of the trial court's decision imply that it might have agreed with FFB that the conversion occurred at the point of sale, rather than at the time of transfer.

{¶31} Nonetheless, the trial court analyzed the applicability of R.C. 1309.332(B) to TFC. Rather than following the decision in *Cortland* that innocent transferees of funds from a deposit account take free and clear of a security interest in the funds, the trial court instead adopted the view of the Tenth District in *RFC Capital*

10

*Corp. v. EarthLink, Inc.*, 2004-Ohio-7146 (10th Dist.), and the United States District Court for the Southern District of Ohio in *Avnet*, 2005 U.S. Dist. LEXIS 59631. Neither case directly discusses R.C. 1309.332(B). Instead, they suggest under other provisions of the UCC that a perfected first-in-time security interest controls absent implied authorization or consent to sell. *See RFC Capital* at ¶ 62-64; *Avnet* at *15-16. Relying on *RFC Capital* and *Avnet*, the trial court concluded that it would be unfair to allow TFC to retain the funds it contracted for given that FFB retained a priority security interest in Shining Knight's and Wexford's assets.

**{¶32}** In its summary judgment order, the trial court highlighted a similar case filed by FFB in federal court against a different MCA that contracted with Shining Knight and Wexford. *See First Fin. Bank v. Fox Capital Group, Inc.*, 633 F.Supp.3d 1041 (S.D. Ohio 2022). In *First Fin. Bank*, the federal district court concluded that R.C. 1309.332(B) barred FFB's claim for conversion absent collusion between the MCA, Shining Knight, and Wexford. *Id.* at 1047. The trial court dismissed this conclusion as inconsistent with the policy adopted in *RFC Capital* and *Avnet*.

**{¶33}** Regarding damages, the trial court declined to award FFB the remaining loan balance it requested. It instead held an evidentiary hearing to ascertain the amount of money TFC owed to FFB on its conversion claim.

### F. Damages Hearing

**{¶34}** At the damages hearing, FFB departed from the two previous methods it had used to calculate damages, namely the amount of the funds withdrawn from the 7599 account by TFC and the amount of Shining Knight's and Wexford's outstanding loan balances. Instead, it advanced a new way of measuring damage in the case: the value of the accounts receivable at the time TFC entered into the factoring agreements with the Sosna entities.

{¶35} Under this new formula, FFB argued that the value of the collateral at the time of conversion was the approximately $4.2 million in future receivables purchased by TFC. In contrast, TFC argued it was the $3 million it agreed to pay Shining Knight and Wexford under the factoring agreements, less what TFC actually paid into the 7599 account.

{¶36} At the damages hearing, the trial court received evidence indicating that there remained a balance of $1,187,886.29 on the Shining Knight loan and that the Wexford loan had been paid in full. FFB also claimed that it had incurred $685,715.22 in interest and $861,428.18 in legal fees.

{¶37} In addition, the trial court heard testimony from FFB's vice president, who testified that the money that TFC received from Shining Knight and Wexford came from Wexford's 7599 account at FFB. However, she could not say exactly how much of the money TFC transferred came from Shining Knight's and Wexford's accounts receivable as opposed to the other 15 Sosna entities with which TFC contracted.

{¶38} The owner of TFC also testified. He explained that TFC did not run a UCC search on Sosna's entities before entering into the factoring agreements. Rather, TFC searched the entities on LexisNexis and relied on Sosna's assertion that there were no liens on the accounts.

{¶39} At the conclusion of the damages hearing, TFC orally moved to dismiss the case pursuant to Civ.R. 41(B)(2) on the basis that FFB did not prove the traceability of the funds withdrawn by TFC. The trial court overruled the motion.

{¶40} On November 3, 2023, in a written entry, the trial court awarded FFB $1,187,886.29 in damages. It held that TFC had converted approximately $3.6 million from the 7599 account. It declined to award attorney fees and interest because TFC

12

was not a party to the provisions allowing these damages in Shining Knight's and Wexford's agreements with the bank. But it set damages in the amount of the outstanding Shining Knight loan balance, finding the damage fairly traceable to TFC's conversion.

{¶41} TFC timely appealed the trial court's judgment. We now consider TFC's assignments of error on appeal.

### *Assignments of Error*

{¶42} TFC raises two assignments of error. The first assignment of error challenges the trial court's summary judgment decision, and the second challenges the trial court's calculation of damages.

{¶43} The first assignment of error raises three separate issues for our review: (1) whether the Shining Knight and Wexford loan documents sufficiently describe accounts receivable as collateral; (2) whether R.C. 1309.332(B) acts as a bar to recovery; and (3) whether FFB proved the elements of the tort of conversion.

{¶44} The second assignment of error also raises three separate issues: (1) whether FFB adequately traced the proceeds of Shining Knight's and Wexford's accounts receivable; (2) whether FFB was attempting to create a windfall by suing multiple MCAs for the same damages; and (3) whether the trial court abused its discretion in awarding FFB more money in damages than it actually lost.

{¶45} Because the second issue of the first assignment of error—that R.C. 1309.332(B) bars recovery—is dispositive of this appeal, we consider it first out of order.

### *R.C. 1309.332(B) and the UCC*

{¶46} As part of its first assignment of error, TFC argues that R.C. 1309.332(B) bars FFB from clawing back funds that have already been disbursed from the 7599

deposit account. As this issue both arises in the context of a summary judgment decision and involves a question of statutory interpretation, the standard of review on appeal is de novo. *See Cortland*, 2021-Ohio-461, at ¶ 9 (11th Dist.).

{¶47} The starting point of our analysis is the statute. To that end, R.C. 1309.332 provides:

> (A) A transferee of money takes the money free of a security interest unless the transferee acts in collusion with the debtor in violating the rights of the secured party.
>
> (B) A transferee of funds from a deposit account takes the funds free of a security interest in the deposit account unless the transferee acts in collusion with the debtor in violating the rights of the secured party.

{¶48} Adopted in 2001, R.C. 1309.332(B) mirrors identical language added the year before to UCC 9-332. Both sections represent an attempt by policymakers to strike a balance between the competing interests of financial institutions on the one hand and clients who utilize their services to execute commercial transactions on the other.

### A.    The Adoption of UCC 9-332

{¶49} The history of UCC 9-332 is instructive in understanding these legislative judgments. That section was preceded in the Uniform Commercial Code by Comment 2(c) to UCC 9-306. Lacking the force of a full UCC code section, Comment 2(c) provided that recipients of cash proceeds from a debtor's checking account "paid out in the operation of the debtor's business" took free of any claim that a secured party may have in the proceeds. *See Keybank Natl. Assn. v. Ruiz Food Prods.*, 2005 U.S. Dist. LEXIS 48262, *15-16 (D. Idaho Sept. 9, 2005).

**{¶50}** Most courts interpreted Comment 2(c) to protect transferees from claw-back suits filed by secured parties after the funds had been transferred out of the bank. *Id*. at *16, citing *Textron Fin. Corp. v. Firstar Bank Wisconsin*, 217 Wis.2d 582 (Wis. Ct. App. 1998). This was the case even if the security interest attached to defined collateral sold for proceeds. *Id*. Once the proceeds from the collateral sale had cleared the bank transfer, courts almost universally protected the transferee against the secured party under Comment 2(c). *Id*.

**{¶51}** But a minority of courts went the opposite way. *Id*. at *17. These courts held that Comment 2(c) and its state-level analogs did not apply if the proceeds were identifiable and could be traced to a specific, defined security interest. *See, e.g., Linn Cooperative Oil Co. v. Norwest Bank Marion, N.A.*, 444 N.W.2d 497, 499 (Iowa 1989).

**{¶52}** In response to this split of authority, the UCC Permanent Editorial Board recommended the addition of supplemental commentary to Comment 2(c) to make clear that the majority line of cases was the correct one. *Keybank*, 2005 U.S. Dist. LEXIS 48262, at *17-18. But in place of inserting this commentary, the drafters instead added Section 9-332, which formalized Comment 2(c)'s place in the UCC. *Id*. at *18. Some might argue this made former Comment 2(c)'s protection for transferees even stronger, given that the suggested language moved from a comment to a provision in the code.

**{¶53}** As the federal district court outlined in *Keybank*, 2005 U.S. Dist. LEXIS 48262, at *18-19, numerous secondary sources confirm this understanding of UCC 9-332's adoption. Once source even goes so far as to suggest that UCC 9-332 negates the minority jurisprudence that allowed a security interest in specific collateral to survive a Comment 2(c) transfer. *Id*. at *18.

15

{¶54} Considering this history and the interpretation of courts and commentators at the time, it seems reasonably likely that UCC 9-322 was intended to have the same effect as the suggested commentary to Comment 2(c)—to entrench the majority view that transferees of funds from a deposit account take free of a security interest, even if that interest was in collateral to which the funds can be traced.

### B. The Meaning of R.C. 1309.332(B)

{¶55} Ohio codified UCC 9-332 in 2001. *See* R.C. 1309.332. A local impact statement supporting the law indicated that, as of 1999, 32 states had aligned their respective laws with Article 9 of the UCC. *See* Ohio Legislative Service Commission, *Fiscal Note & Local Impact Statement S.B. 74* (Apr. 4, 2001), https://search-prod.lis.state.oh.us/api/v2/general_assembly_124/legislation/sb74/supporting_documents/fn_124_sb74in/pdf/ (accessed Oct. 3, 2024). The purpose of Ohio's law was to accomplish the same objective. *Id.*

{¶56} R.C. 1309.332(B) contains virtually identical commentary to UCC 9-332(B). Under a heading entitled "Scope of This Section," the comments explain that the law "affords broad protection to transferees who take funds from a deposit account." R.C. 1309.332(B), Comment 2. The comments also explain the policy embodied in the law. Extinguishing the security interest once funds have transferred out of a deposit account to a noncolluding transferee "helps to ensure that security interests in deposit accounts do not impair the free flow of funds." R.C. 1309.332(B), Comment 3. In balancing respect for security interests against the need for uninterrupted commerce, the comments to R.C. 1309.332(B) place a "high value on finality" and accordingly instruct that opportunities for upsetting completed transactions should be "severely limited." *Id.*

### C. R.C. 1309.332(B) and Security Interests in Deposit Accounts

{¶57} Drawing support from this commentary, TFC argues that R.C. 1309.332(B) bars FFB from recovering the funds it received from the 7599 account. Its position relies upon both the plain meaning of the statute, as well as the public policy arguments advanced in Comment 3 that support extinguishing a perfected first-priority security interest in favor of transferees from deposit accounts. Citing the UCC commentary, TFC contends that claw-back lawsuits like this one undermine the free flow of commerce, upset the preference for finality in commercial transactions, and wrongfully punish third parties who stop short of colluding with debtors.

{¶58} FFB, on the other hand, argues that R.C. 1309.332(B) merely strips funds passing through a deposit account of a security interest in the account, not in the funds themselves. It too advances public policy arguments in support of this interpretation, chief among them the importance of protecting perfected first-priority security interests from transferees who take collateral proceeds out of a deposit account on notice of their subservient position.

{¶59} Both parties seem to agree that case law construing UCC 9-332 is instructive. But there is a split of authority on which interpretation of UCC 9-332 is correct, although a distinct majority and minority approach have emerged since UCC 9-332 was adopted. Virtually every court to consider the question–and every Ohio court to do so in a published decision–has concluded that TFC's reading controls. *See, e.g., Keybank*, 2005 U.S. Dist. LEXIS 48262, at *19-20 ("an innocent transferee takes funds transferred from a deposit account free of a security interest in the collateral of which the funds were proceeds"); *First Fin. Bank*, 633 F.Supp.3d at 1046 (prohibiting FFB from pursuing conversion claim against MCA involving Sosna entities absent collusion because R.C. 1309.332(B) bars recovery); *Cortland*, 2021-Ohio-461, at ¶ 18 (11th Dist.) (relying on comments to R.C. 1309.332(B) to bar conversion claim against

transferee from deposit account that was the subject of a perfected security interest); *Legal Asset Funding, LLC v. Cousins*, 2013 N.J. Super. Unpub. LEXIS 1241, *18 (N.J. Super. May 23, 2013) (noting that UCC 9-332(B) does not follow creditor priority and may upset normal priority of security interests). Adding to the majority approach in Ohio is the fact that a different judge of the Hamilton County Common Pleas Court than the one whose decision we are reviewing dismissed a related Sosna MCA case brought by FFB under R.C. 1309.332(B), and FFB did not appeal. *See First Fin. Bank v. Avanza*, Hamilton C.P. No. A-2101701 (Jul. 11, 2023) (granting summary judgment to Avanza on the basis of *Cortland*).

{**¶60**} The leading authority in Ohio on this question is *Cortland*, 2021-Ohio-461 (11th Dist.).[7] In that case, the Eleventh District concluded that a security interest in a deposit account cannot be divorced from a security interest in the obligation to pay funds from the account. *Id.* at ¶ 15-16. In doing so, it leaned heavily on the fact that Article 9 of the UCC defines a "deposit account" as an obligation to pay funds from the account. *Id.* Viewed in this way, a security interest in a deposit account is merely a security interest in a right to payment from the account, i.e., the funds deposited in the account. *Id.* at ¶ 16-18. Thus, under *Cortland*, R.C. 1309.332(B) extinguishes a security interest in a right to payment from the deposit account once payment has been made from the account to a noncolluding third party. *Id.* at ¶ 19.

{**¶61**} FFB nonetheless argues that R.C. 1309.332(B) does not bar its conversion action because the provision applies solely to a security interest in a deposit account and not to the funds contained within the deposit account. FFB contends that

---

[7] The Ohio Supreme Court accepted the Eleventh District's decision in *Cortland* for review, but the matter was dismissed before the court reached a decision as to the merits of the discretionary appeal. *See Farmers Nat. Bank v. Platinum Rapid Funding Group, Ltd.*, 2023-Ohio-1649.

its security interest in Shining Knight's and Wexford's accounts receivable accordingly survived the transfer of funds through Wexford's 7599 deposit account because R.C. 1309.332(B) at most stripped FFB of its security interest in the account itself.

**{¶62}** In advancing this argument, FFB relies heavily on *In re Tusa-Expo Holdings, Inc.*, 811 F.3d 786 (5th Cir. 2016). That case involved a complicated three-way financial relationship between a furniture designer, a furniture retailer, and a financing company. Tusa, the furniture retailer, operated furniture outlets that would sell furniture designed by Knoll to its customers. *Id.* at 789. Knoll advanced the furniture to Tusa pursuant to a perfected security interest on Knoll's part in Tusa's accounts receivable. *Id.* Tusa then acquired Office Expo, an underperforming retail outlet, to expand its retail footprint. *Id.* Tusa began siphoning off cash to Office Expo to bolster its performance, creating past-due balances on Tusa's account with Knoll. *Id.* at 789-790. Tusa solved the problem by entering into a financing agreement with Textron, a financing company, under which Textron loaned Tusa $6.5 million in exchange for a first-priority security interest in all Tusa's assets including Knoll's collateral. *Id.* at 790. Tusa was then required to have its customers deposit their payments into a lockbox account controlled by Textron. *Id.* To facilitate the deal, Textron and Knoll entered into a subordination agreement whereby Knoll retained a first-priority security interest in specified receivables and a second-priority security interest in all other of Tusa's assets. *Id.* Tusa then went bankrupt, leaving the parties to fight over the remaining assets. *Id.*

**{¶63}** A key issue on appeal was whether Texas's version of UCC 9-332(B) stripped Knoll's first-priority security interest in the specified receivables once they were paid into the Textron lockbox by Tusa's customers and then transferred from the lockbox to Textron. *Id.* at 795. The Fifth Circuit held that, based on the plain meaning

of the provision, Knoll's security interest survived the transfer. *Id.* at 797. In doing so, the court interpreted the Texas analog to UCC 9-332(B) to wash only a security interest in a deposit account itself from funds passing through the account, as opposed to cleansing the funds of a security interest that might attach specifically to them. *Id.* It supported this reading with UCC comments implying that the transfer of the entire deposit account is distinct from the transfer of funds in the account from a security interest perspective. *Id.* But it also grounded its holding in the specific facts of the case, remarking that its protection of Knoll's security interest was consistent with both the subrogation agreement between it and Textron, as well as the parties' intent that Knoll's interest in specific receivables predominate. *Id.* at 797, fn. 35. Thus, in many respects, the Fifth Circuit's reading of Texas's version of the statute merely tracked the parties' contractual obligations.

{¶64} As the court in *Tusa* noted, at least one other court in Texas had adopted its interpretation prior to its decision. *Id.* at 796, fn.30, citing *Madisonville State Bank v. Canterbury*, 209 S.W.3d 254 (Tx. Ct. App. 2006). But no other court outside of Texas has followed this logic since the adoption of UCC 9-332(B). And notably, the *Tusa* decision did not wrestle with the legislative history of UCC 9-332, nor did it discuss contradictory federal authority—namely *Keybank*, 2005 U.S. Dist. LEXIS 48262—even though *Keybank* was decided over a decade before *Tusa*.

{¶65} Moreover, key factual differences separate *Tusa* from the case before us. *Tusa* dealt with a subordination agreement between the first-priority secured party and the ultimate transferee, and *Tusa*'s reading of the statute was inextricably linked with the parties' contractual agreement. *Tusa*, 811 F.3d at 790, 797 (noting that the court's holding, in which it deemed Texas's version of UCC 9-332(B) inapplicable, was "consistent with the Subordination Agreement" between the parties). In contrast, no

contractual arrangement exists between FFB and TFC regarding the prioritization of the parties' respective security interests in Shining Knight's and Wexford's accounts receivable. The first-priority secured party in *Tusa* also retained a security interest in specific accounts receivable identified by contract, rather than undefined accounts receivable as a generic asset. *Id.* at 789-790. Here, however, FFB secured its loan with a general security interest in Shining Knight's and Wexford's receivables not referenced by a particular account or amount number.

{¶66} In light of these distinctions, we find *Keybank* and *Cortland* to be the more persuasive precedent on the proper interpretation of R.C. 1309.332(B). With the statutory text as a starting point, *Cortland* illuminates that a security interest in a deposit account is really no different than a security interest in the funds in the account. *Cortland*, 2021-Ohio-461, at ¶ 15-16 (11th Dist.). *Keybank*'s analysis of the legislative history and commentary to UCC 9-332(B) then confirms that the provision is intended to provide broad support for transferees. *See Keybank*, 2005 U.S. Dist. LEXIS 48262, at *19. While there are strong public policy arguments on both sides, both cases make clear that the code and statute embody a legislative preference for transactional finality over the preservation of security interests when it comes to funds moving through deposit accounts. *Id.* at *13-14; *Cortland* at ¶ 19.

{¶67} We therefore adopt the majority approach and hold that R.C. 1309.332(B) bars recovery for conversion when funds secured by a first-priority security interest transfer through a deposit account to a noncolluding third party. We agree with *Keybank* and *Cortland* that R.C. 1309.332(B) strips the funds themselves, and not just the deposit account, of the perfected security interest.

{¶68} As a result, FFB cannot recover in conversion from TFC absent collusion, which it has not alleged in this case. While we appreciate the trial court's

concern for equity and FFB's desire to protect its first-in-time security interest, we must nonetheless follow the law adopted by the legislature. R.C. 1309.332(B) represents the General Assembly's reasoned judgment that funds transferred out of a deposit account should not be the subject of conversion lawsuits absent some evidence that the account holder colluded with the funds' recipient. In the end, this means that security interests in deposit accounts are simply less secure than other forms of collateral.

{¶69} One additional point bears mentioning. Throughout this litigation, FFB has shifted its theory of recovery, arguing initially that its action for conversion was to recover the funds TFC transferred out of Wexford's 7599 account and then later shifting to the contention that the conversion occurred when TFC contracted to purchase receivables from the 18 Sosna entities only after TFC asserted a R.C. 1309.332(B) defense in its initial summary judgment filing. On appeal, FFB repeats the argument that it avoids the application of R.C. 1309.332(B) because TFC converted its collateral at the time of the factoring agreements, before any funds ever transferred through the 7599 deposit account.

{¶70} FFB's contention is unpersuasive. This is because FFB could not change its theory of recovery in response to TFC's summary judgment response. *See Aronhalt v. Castle*, 2012-Ohio-5666, ¶ 26, 41 (10th Dist.). FFB sued on a theory that TFC converted its asset by withdrawing funds from the 7599 account, and it could not alter that position at the summary judgment stage. *Id.* If FFB had intended to sue on the basis of a contract theory rather than a transfer theory, it could have done so prior to TFC's summary judgment pleadings. *Id.*

22

**{¶71}** We accordingly sustain TFC's first assignment of error insofar as it argues that R.C. 1309.332(B) bars FFB's action for conversion. We remand the cause to the trial court with instructions to dismiss FFB's complaint.

**{¶72}** Our holding as to this assignment of error renders the remainder of TFC's appeal moot, and we decline to address TFC's second assignment of error on this basis.

### *Conclusion*

**{¶73}** The General Assembly enacted R.C. 1309.332(B) for the stated purpose of ensuring finality in commercial transactions. Absent collusion between a third party receiving funds from a deposit account and the account holder, and consistent with the legislature's policy preference, a party with a security interest in a deposit account cannot sue for conversion under that statute.

**{¶74}** FFB therefore cannot sue TFC for conversion. We accordingly sustain TFC's first assignment of error, reverse the trial court's judgment, and remand the cause to the trial court with instructions to dismiss FFB's complaint.

Judgment reversed and cause remanded.

**BOCK, P.J.,** and **CROUSE, J.,** concur**.**

Please note:
    The court has recorded its own on the date of the release of this opinion.